BUTLER HARD RUBBER COMPANY v. THE MAYOR AND COMMON COUNCIL OF THE CITY OF NEWARK ET AL.

1. The Newbrough company was the owner of a tract of land on both sides of the Pequannock river, including the bed of the stream. In 1869 the company built a mill, called the Tyndall mill, and erected a dam and constructed a raceway for the purpose of diverting the waters of the river as a water-power for the use of their mill. Subsequently the company constructed another mill, now owned by the Butler Hard Rubber Company, higher up on the raceway. The waters from the stream were first used through the raceway for driving the last-mentioned mill, and after they were discharged into the tailrace were carried down to the Tyndall mill. By a deed dated February 12th, 1873, the Newbrough company conveyed to Richard B. Tyndall the premises at the lower end of the raceway. The deed, after the description of the premises granted, contained the provision that the party of the first part " doth hereby grant, assign and convey to the party of the second part, his heirs and assigns, the joint right with the party of the first part to all the water of the Pequannock river at the dam of the said party of the first part ; " also, the joint right to take said water from said dam through the canal or raceway running from said dam to the raceway or mill of the party of the first part, and thence through the tailrace of the said mill to the premises therein conveyed, with a covenant that each of the parties should have the right to repair or rebuild the said dam or to repair or enlarge said canal at the cost of the party repairing, enlarging or rebuilding. By a deed dated July 24th, 1873, the Newbrough company conveyed to Rosenthal and Strauss, under whom the plaintiffs take title, the tract of land on which the upper mill had been erected, with the strip of land on which the raceway was situate, extending up the river to a point distant seven and five-tenths feet from the southeast corner of the stone abutment at the gatehouse at the upper end of the canal, together with all the rights of the dam and of the flowage possessed by the said party of the first part, subject in all respects to the joint rights, privileges and easements affecting the dam and the water in the Pequannock expressed and contained in the deed to Tyndall. The city of Newark, under the act of April 21st, 1876 (*Rev., p.* 721), instituted proceedings to condemn the plaintiffs' right to the waters of the stream. *Held—* (1) That the grant to Rosenthal and Strauss conveyed the right to the waters of the stream as appurtenant to the conveyance of the land, and that they were entitled to compensation for the damages sustained by the taking of the waters for the purposes mentioned in said act. *Stockport Water Works Co.* v. *Potter*, 3 *Hurlst. & C.* 300 ; *Ormerod* v. *Todmorden,*

*L. R*, 11 *Q. B. D.* 155, and *Kensit* v. *G. E. R. Co.*, *L. R.*, 27 *Ch. Div.* 122, distinguished.   (2) That Rosenthal and Strauss, under their deed, had the right to enlarge the raceway, either under the reservation contained in the deed to Tyndall, or under the Newbrough company, which, as the owners of the fee of the upper mill and of the raceway, dam and water-power, had the right to enlarge the raceway—the conveyance by the Newbrough company to them being of all rights of the dam and of all the flowage possessed by the said party of the first part.   (3) That the reservation in the deed by the Newbrough company to Rosenthal and Strauss of the right to construct a dam below the dam that was in the stream when the grant to Rosenthal and Strauss was made, restrained the grantees from increasing the height of the dam, but did not restrict their right to widen the raceway for the purpose of utilizing all the water that the dam then in existence would divert from the stream.   (4) That if the plaintiffs diverted the waters for a use not permitted by the covenants in the Tyndall deed, that fact might create a right of suit by the owners of the Tyndall property, but did not deprive the plaintiffs of their title to the water as it flowed through the raceway.

2. In ascertaining what is just compensation for lands taken under the right of eminent domain, the law has established the legal rule that if the whole property be taken the market value of the property, as between an owner willing to sell and a purchaser desiring to buy, is the measure of compensation.   If part only is taken the problem is the difference between the market value of the property before it was taken or interfered with and the market value that remains in the property after the injury is done.

3. Where the city proposes to take a certain quantity of water in its condemnation proceedings it will acquire a right to take the quantity of water mentioned, and the damages to the landowner will be assessed on the basis of the quantity of water proposed to be taken, without regard to the quantity of water actually used at the time the proceedings were commenced.

4. Where the premises consist of a factory with machinery driven by the waters of a stream of which the city takes a part, if in the judgment of the jury it would be proper and judicious to install a separate plant of steam-power to supply the power lost by the diversion of the water, the expense of that method of reconstruction may be taken into consideration in ascertaining what sum of money would amount to just compensation, but the landowner is not entitled to have his property improved beyond its original value and cannot be allowed more of such outlay than will reimburse him for his actual loss.

On rule to show cause.   On case certified.

The city of Newark, having contracted with the East Jersey Water Company to construct for said city certain water works for the purpose of furnishing the city with a new water-supply, to be taken from the Pequannock river by means of a reservoir, called the intake reservoir, by means of which to divert and take from the Pequannock river water for the purpose aforesaid, applied to a justice of the Supreme Court for the appointment of commissioners to appraise the value and assess the damages which the Butler Hard Rubber Company claimed to be entitled to by reason of the proposed diversion of the waters of the said stream, pursuant to an act of the legislature entitled "An act to empower cities to acquire land and other property for public use by condemnation," approved April 1st, 1895. *Gen. Stat., p.* 1388, § 57, &c. Commissioners having been appointed pursuant to said act, made report assessing the value of the water and water rights of the said company and the damages which the said company as owners claimed to be entitled to. The city of Newark, having appealed from the said award, the trial of the appeal came on before the Circuit Court of the county of Essex, upon an issue framed for that purpose. In pursuance of the statute, an issue was made " to assess the value of so much of the water of the Pequannock to the said lands and premises of the said Butler Hard Rubber Company as will be necessary to furnish the said city with fifty millions of gallons of water each and every day, diverted and taken from the said river at the intake reservoir, and the diminution in the value of the said lands and premises caused by the diversion of the said quantity of water from the said river in the place aforesaid, and the damages which the said Butler Hard Rubber Company as the owners of said lands and real estate would sustain by reason thereof."

On the trial of this appeal a verdict for the plaintiffs was rendered by the jury for substantial damages, and thereupon the Circuit Court granted a rule to show cause, and certified to the Supreme Court the following case made and stated for its advisory opinion on questions of law arising thereon, as follows:

The above cause came on for trial on appeal from an award by commissioners appointed to assess the damages ·to the plaintiffs by reason of the diversion from the Pequannock river of fifty millions of gallons of water each and every day in the year, at the Macopin Intake dam, four miles above the plaintiff's property.

The condemning party, in its petition, made the following statement of the position of affairs:

" Your petitioners further show that below the reservoir constructed as aforesaid, called the Intake reservoir, and distant therefrom about four miles, and. at the town of Butler, in the said county of Morris, the Butler Hard Rubber Company are the owners of a certain factory property located on the southerly side of the Pequannock river, consisting of a lot of land adjacent to the said river, of several acres in extent, upon which are certain mills and factory buildings for the manufacture of rubber goods and rubber products. That as part of the power to drive the machinery in the factories located on the property the said company has been accustomed to draw by means of a raceway from the Pequannock river a large quantity of water, and claimed the right to take water from the said river for the purpose of furnishing power to the said mills or factories and for other purposes."

The following facts appeared in the case:

A short time prior to 1873, a corporation known as the Newbrough company owned all the land on each side of the Pequannock river from a point just west of the dam used by plaintiffs, easterly to the part below the tract now owned by the plaintiffs.

Several conveyances were then made by which, after a grant to Richard B. Tyndall of a tract of seven acres and ninety-eight hundredths of an acre, shown on said map, the plaintiffs became seized of the present tract of fifteen acres and ninety-five hundredths of an acre, which includes the large tract of land whereon the factory buildings are located and the land upon which the head and tailrace conveying the water to and from the mill are placed. The land in the

deed, as described by metes and bounds, does not include the dam or headgates, and the plaintiffs do not own any land on the Pequannock river.

All the title deeds are sent up, together with the maps, the rulings of the court and its charge, with this certificate.

One of said deeds contains a provision for a siderace or flume around the plaintiffs' mill, and plans for the same were made and filed in the Morris county clerk's office, and a copy thereof is bound in with the maps and is numbered 3.

The headrace belonging to the Butler mill is some three-quarters of a mile long, and the plaintiffs have so widened and deepened it that it will vent considerably more water than the original race did (forty per cent. more, as shown by defendant's testimony), at the time that plaintiffs' title was severed from that of the Newbrough company. No objection appears to have been made to this alteration of the race by the owner of the Tyndall site.

The defendants are the present owners of both the Tyndall mill site and of all the land bordering on the river which was originally owned by the Newbrough company, except the property of the plaintiffs.

The plaintiffs have tapped the headrace with a six-inch pipe, by which they abstract therefrom as much water as that pipe will accommodate, and the same is carried through pipes to different parts of the mill and distributed there for purposes other than power, such as washing, grinding, vulcanizing, and in the boilers, and some of it is returned to the raceway and reaches the Tyndall mill below, and some does not.

No objection appears to have been made by Tyndall to such abstraction, but neither the enlargement of the race nor the abstraction of the water has continued long enough to ripen into a prescriptive right.

There is a dispute as to whether the dam has or has not been raised, but no question exists as to the fact that the original headgates are still in use, the same in size as originally constructed, and that they are only partially raised in

order to allow the water that the headrace in its present condition will accommodate, to pass through them.

The position of the dam, headgates and headrace, in reference to the river-bed, appears on map No. 4.

The plaintiffs have been accustomed to close the gates leading into their mill, in order to allow the race to fill up, thereby arresting the flow of the water and increasing the power derived therefrom at their mill.

This custom has not been objected to by the owner of the Tyndall site, but no prescriptive right to do so has been acquired.

The head and fall enjoyed by the plaintiffs are about thirty feet, producing a power of disputed amount and between one hundred and twenty-five and two hundred and ten horsepower.

In 1885 the plaintiffs erected in their mill, steam engines with a rated power of five hundred horse, and an actual power of considerably greater amount, and with a gang of boilers and a stack sufficient to produce all the steam the engines can require, including the proposed new engine. The plaintiffs were, against the defendant's objection, permitted to show what would be the first cost of a stack, boiler, boiler-house, engine, &c., of a size sufficient to produce an amount of power equal to that derived from the amount of water diverted, and also the cost per day of fuel, help, oil, repairs, &c., to maintain the same.

The plaintiffs further claimed that the engine already installed could not, by reason of its position, be safely relied on to run certain machines, known as the breaking-down rolls, and offered evidence of the cost of installing and operating a separate engine of two hundred horse-power to do that work.

On the question of damages or injury to the value of the owner's premises, caused by the diversion of water, the defendant gave proof to show that the steam engines used upon the premises for the purpose of generating power could be so improved by compounding, that at a cost of not to exceed $4,500, a saving of twenty-five per cent. of the steam now

used could be effected, and that at an additional cost not to exceed $8,000, a new engine sufficient to furnish all the power required to run the line of shafting by which the tin rollers and other machinery on that line of shafting were operated could be put in with proper connections and gearing complete, and that this additional engine to supply such power could be operated at an additional expense not to exceed $625 annually.    In other words, that the owner's plant could be made as valuable, and, indeed, more valuable, than it was before the diversion was effected, by the use of $25,000 in money; one-half of this sum to be used in improving the present machinery, and the interest of one-half to pay the additional expenses of operating the new machinery.

After this proof had been produced the court was requested to charge the jury that if they believed that the Butler Hard Rubber Company could, by the adoption of improved mechanical appliances, reduce the damage it would suffer by reason of the diversion, then the city is entitled to the benefit of such advantage, and the jury must give defendant the benefit thereof in reaching their verdict.

In commenting upon this phase of the case in his charge, the judge said:

"I turn now to the next, the line of shafting that is connected with the forty-three-inch wheel.    Two methods have been suggested of supplying that loss of power.    One by driving this line of shafting from the five-hundred horsepower engine that is now there by means of the connection which is there now by bevel gearing, and that proposition on the part of the defendant has been criticised.    The force of that criticism I shall leave for your consideration.    It is said that the line of shafting is too long, and that the character of the work to be done on the breaking-down rollers is such that it would be unsafe to rely upon obtaining this power from the five-hundred horse-power engine.    The suggestion, also, is that this five-hundred horse-power engine be compounded.    As I understand the evidence, and I believe that is the case, the compounding of an engine does not in-

crease its efficiency; it simply saves fuel.   If that method of reconstructing these premises to meet the altered conditions of affairs meets the approbation of this jury, make the compensation on the basis of such readjustment.   You ought to allow the plaintiffs the amount of the cost of that five-hundred horse-power engine in comparison with the amount of work that was done by that engine elsewhere and the amount of work required to be done there.   Take an illustration :  A farmer has a large stock of horses, more than he needs to cultivate his farm.   A man comes along and takes away one of his horses and he sues to recover his loss.   When he comes into court he says, ' Why, you have got horses enough for the farm; take one of them.'   He cannot be allowed, gentlemen, to rely upon that method of accomplishing the work that the farmer needs to do in the cultivation of his farm, unless he pays for the horse.   So, in this case, if the power taken from this five-hundred horse-power engine is used for the propulsion of that machinery, then they ought to pay a proportionate part of the cost of the five-hundred horse-power engine which is used for that purpose of driving this machinery."

The question is whether the court did not err in submitting this question to the jury in this form, and also whether the court should not have instructed the jury, if they believed the testimony thus offered to be true, to make compensation to the owners on the basis of the testimony thus given.

The plaintiffs formerly had two wheels—one a thirty-six-inch the other a forty-three-inch wheel—in use.   The thirty-six-inch wheel was removed and preparations made to substitute an additional forty-three-inch wheel at the time of the diversion.

The questions of law arising in the foregoing cause and reserved for review are, in addition to the foregoing, the following :

1. Are the defendants, under their title, entitled to more than nominal damages for the obstruction of water from the Pequannock river ?

2. Should the damages be based on the condition of the dam and raceway in 1873?

(*a*) Have the plaintiffs the right to change the raceway, so that it would draw more water through it than in 1873?

(*b*) Have the plaintiffs a right to obstruct or use water from the raceway or flume for purposes other than power?

(*c*) Have the plaintiffs a right to arrest the flow of the water through the raceway in its progress down to the Tyndall property?

3. Should the jury have been instructed that the evidence of the cost of installing and maintaining and substituting a steam plant with which to run machinery heretofore operated by water-power, was competent as a means of arriving at or determining the difference in market value of the property on account of the diversion, according to the terms of the charge?

4. Should the jury have been allowed, in estimating the difference in market value of the plaintiffs' property by reason of the diversion, to consider the theory of supplying the power by other means, as directed by the court in the charge?

Argued at February Term, 1897, before Justices DEPUE, VAN SYCKEL and LIPPINCOTT.

For the plaintiffs, *Joseph L. Munn* and *Alvah A. Clark*.

For the defendants, *Robert H. McCarter* and *Joseph Coult*.

The opinion of the court was delivered by

DEPUE, J. The first question certified is whether the plaintiffs are entitled to more than nominal damages for the diversion of the water from the Pequannock river. The defendant contends that, as against the company diverting the waters of the stream above the dam, the Butler company has not such property in the stream as will enable it to have compensation for such diversion, and that the damages recoverable in this case should be merely nominal. To maintain this contention the defendant relies on several cases in the English

courts, of which *Stockport Water Works Co.* v. *Potter*, 3 *Hurlst. & C.* 300 ; *Ormerod* v. *Todmorden, L. R.*, 11 *Q. B. D.* 155, and *Kensit* v. *G. E. R. Co.*, 27 *Ch. Div.* 122, are types. In the Stockport Water Works case it was held, by a divided court, Pollock, C. B., and Channel, B., against the dissent of Baron Bramwell, that where a riparian proprietor conveys land not abutting on the stream and grants water rights to be used thereon, the grant of water rights, though valid as against the grantor, creates no rights for the interruption of which the grantee can sue a third party. The plaintiff in that case was a water company incorporated for the purpose of supplying the town of Stockport with water. The company had obtained a conveyance of a lot of land from a person who was a riparian owner. The land conveyed did not abut on the river. By the terms of the conveyance the grantor conveyed to the company the full and free use of the water which should at any time be raised by their pumps. The action was by the water company against a riparian proprietor higher up the stream for fouling the waters of the river, from which the plaintiffs derived their supply of water. The decision of the majority of the court was that the grant of water rights, though valid as against the grantor, created no rights in the grantee for the interference with which the latter could maintain the suit. The right granted by the conveyance was held by Pollock, C. B., in delivering the opinion of the majority of the court, to be a right in gross, which created a mere license. The water company laid its pipe by means of which it carried the waters of the river from the stream to supply its works. When the conveyance was made the property conveyed was unimproved, and without any connection with the stream. The means by which the water was to be drawn from the stream and utilized by the grantee were to be executed by the latter. At the close of his opinion, Pollock, C. B., carefully distinguished a grant in gross, such as was involved in that decision, from the case where a riparian proprietor makes two streams instead of one, and grants land on the new stream, which he declared to be analogous to a grant of

a portion of a river bank, and not analogous to a grant of a portion of a riparian estate not abutting on the river. He adds that in the case of a grant of land on the new stream the grantee obtains a right of access to the river, and it is by virtue of that right of access that he obtains his water rights. In Ormerod *v.* Todmorden the action was brought by the plaintiffs, as riparian owners of lands further down the stream, to recover damages for injuriously affecting the water of the stream. The defendants in that case were not riparian owners, but they had a grant from a riparian owner of the right to lay pipes into the bed of the river for the purpose of conveying water through the land of such riparian owner to their own premises. In the opinions in the Court of Appeals the defendants' right was called a mere easement over the land, and it was held that by the terms of the deed no right to the flow of the water or to interfere with the flow had been transferred to the defendants. In that case, Brett, M. R., distinguished the case in hand from Nuttall *v.* Bracewell, which will presently be cited. In Kensit *v.* Great Eastern Railway Co. the action was brought by a riparian owner further down the stream against the defendant for polluting and diminishing the flow of water by diverting it to premises of his own, which were not riparian lands. The defendants' rights were acquired under an agreement with the riparian owner. The water was to be diverted by the aid of a three-inch pipe from the stream to the defendants' premises. The defendants' right is called in the opinions a license, or a grant to take water. Lindley, L. J., in his opinion refers to Stockport Water Works Co. *v.* Potter and Ormerod *v.* Todmorden, and says that neither of those cases decides that a licensee or grantee of a riparian proprietor cannot take any water from the stream; "they decide nothing of the sort, nor do they warrant any such inference."

It will be observed that in each of these cases a property right was recognized in the licensee, which was valid, at least against the grantor, and that the actions were by a riparian proprietor or against a riparian proprietor, against whose rights

as riparian owner a grant of water in gross was held to be invalid.   The defendants in this case are not asserting rights as riparian owners, but are taking property under the power of eminent domain.   In this as well as in other respects the cases cited are inapplicable to this litigation.   The mill on the Butler Hard Rubber Company's premises was built by the Newbrough company, and the dam and raceway were constructed by that company to supply the mill with water from the stream.   The evidence shows that the Newbrough company was the owner of a considerable tract of land on both sides of the Pequannock.   As early as 1869 a water-power was constructed by the company on this stream, with a dam and raceway in the location of the dam and· raceway there at the present time.   The Newbrough company was then the owner of the Tyndall mill as well as the mill now owned by the plaintiffs.   For this water-power, as then con-structed, the water was taken from the upper end of the New-brough tract by means of the dam, was carried by the raceway across the bend in the Pequannock, supplying power for both mills, and was discharged again into the Pequannock, below the Tyndall property.   The grant in the deed from the New-brough company to Rosenthal and Strauss, under whom the plaintiffs acquired title, conveyed the mill and premises, to-gether with all the rights of the dam and of all the flowage possessed by the Newbrough company, and in the deed the premises conveyed included the fee of the raceway to within seven and five-tenths feet from the southwest corner of the stone abutment at the gatehouse at the upper end of the raceway. The water rights passed, not as a license or as an easement, but as appurtenant to the mill premises.   *Nuttall* v. *Brace-well, L. R.,* 2 *Exch.* 1, and *Holker* v. *Porritt, L. R.,* 10 *Exch.* 59, in which it was held that where the riparian owner creates a new stream, any person having land upon it by a grant from the riparian owner in virtue of which he obtains his water rights, would have the rights of a riparian proprietor, and entitled to maintain an action for an interference with his rights, are more nearly applicable to this case than are the

other cases cited by the defendants from the English courts. Besides the courses and distances of the grant of the raceway, as delineated on the map made part of the description of the premises conveyed, indicate a grant to the headgates, which directly abut upon and open into the pondage of the stream at the dam. Under these circumstances it would be a refinement of construction to hold that, as between the parties to the deed, Rosenthal and Strauss did not acquire a title which made them riparian owners.

But it is unnecessary to discuss this subject further. The right the plaintiffs obtained to the use of the waters of the stream in virtue of the grant from the Newbrough company is undeniably property. As such, under our constitution, they cannot be deprived of it except on compensation made. This principle applies whether the water taken or the injury done to the mill property by diverting the waters from the mill be considered. The destruction of private property, either total or partial, or the diminution of its value, by the act of the government directly and not merely incidentally affecting it, which deprives the owner of the ordinary use of it, is a taking, within the constitutional provision, which can be effected only under the right of eminent domain, subject to the constitutional limitation of making just compensation. *Trenton Water Power Co. v. Raff,* 7 *Vroom* 335, 343. Indeed, the statute under which the water company is proceeding deals with water rights as property, and as property distinct from land. The second section of the statute provides that in case of any disagreement between the city and the water company, or the owner of any other land or *water rights* which may be required for the said purposes or *affected* by any operation connected therewith, as to the amount of compensation to be made to said water company or to such owner, the Circuit Court shall, on application of either party, appoint commissioners to examine the real estate and personal property of said water company, or any other land or *water rights* and estimate the value thereof or damages sustained thereby. By the third section it is made the duty of the jury, in case of an

appeal, to assess the value of the land or *water rights* and the damages sustained. *Rev., p.* 721. In the act of 1890, which provides for power of aqueduct boards or other water boards having the control of the water-supply in the cities of this state, to contract for and construct works, to purchase or condemn lands, *waters and rights,* the words " lands, *waters, personal rights or privileges* " are used. The plaintiffs, having property in these water rights, however acquired, are entitled to substantial damages for the injury resulting from the diversion.

The second question contained in the certificate is: "Should the damages be based on the condition of the dam and raceway in 1873? (*a*) Had the plaintiffs the right to change the raceway so that it would draw more water through it than in 1873? (*b*) Have the plaintiffs a right to obstruct or use water from the raceway or flume for purposes other than power? (*c*) Have the plaintiffs a right to arrest the flow of the water through the raceway in its progress down to the Tyndall property?"

The trial judge, in the construction of the deed from the Newbrough company, under which the plaintiffs claim title, held that the title of the plaintiffs in respect to the diversion of water from the stream was limited to the height of the dam that was in the river in 1873—the structure and the efficient effect of the dam as it was at that time. The discussion of counsel was directed to the last branch of the proposition above set out—as to the right of the plaintiffs to change the raceway so that it would draw more water through it than in 1873.

By a deed dated February 12th, 1873, the Newbrough company conveyed to Richard B. Tyndall the premises below what is now the mill property of the Butler Hard Rubber Company, consisting of the tract on which the lower mill was located. That deed, after the description of the granted premises, contained the following provisions: "And the said party of the first part, for itself, for its successors and assigns, doth hereby grant, assign and convey to the said party of the second

part, his heirs and assigns, the *joint* right with said party of the first part to all the water of the Pequannock river at the dam of said party of the first part, and also the *joint* right to take said water from said dam through the canal or raceway running from said dam to the mill of the party of the first part now on its premises and thence through the said tailrace of said mill to the premises herein conveyed; either party to take the water from the dam or river by the canal and flume as hereinafter provided, and in no other way. And the parties hereto do mutually covenant and agree that each of them, and their respective successors, heirs and assigns, shall have the right to repair or rebuild said dam and to repair or enlarge said canal at the cost and expense of the party repairing, enlarging or rebuilding. * * * Provided, also, such repairs, enlargement or rebuilding shall be made without unnecessary injury to the property of the other party, its or his successors, heirs and assigns. Said party of the second part, his heirs and assigns, shall have the right to construct a side channel or flume from said canal to said tailrace, and shall maintain the same at his or their expense, and not to the unnecessary injury of the property of the party of the first part. Said channel or flume shall be built in a good, durable and substantial manner, and, when built, shall be under the supervision of the party of the first part, its successors and assigns, who shall cause and allow the water of the said canal and river to flow freely at all times, either through the said channel or flume or through the said mill into the tailrace above mentioned, into and upon the premises hereby conveyed. The place for the construction of such channel or flume shall be approved by the party of the first part, its successors and assigns, before work on it is commenced; and in case the said parties hereto, their heirs, successors and assigns, respectively, cannot agree upon a plan, each party hereto shall appoint a civil engineer to determine upon a plan; and in case of their disagreement, said engineers shall appoint a third engineer to make and furnish a plan for he construction of said flume, which said plan, when adopted by the three engineers or by a

majority of them, shall be binding on all the parties concerned. * * * Provided, that the water shall not be so taken from said headrace as to interfere with the use of the mill now on said premises near the lower end of said race, or to unnecessarily impair the value of the premises of the said party of the first part as a manufacturing property."

The words "joint right" used in this deed express the purpose of the grantor to give to these parties an equal right to the water in the stream, to be used successively, the Newbrough company using it first for the purposes of their mill, and after its discharge into the tailrace then to be used at the Tyndall mill. This construction is necessary to give effect to the intention of the parties, having regard to the provisions in the deed and the location of the waterways as delineated on the map. By the terms of the deed either party was allowed to repair the dam, and the right was conferred upon each party to use the raceway, with the right to enlarge and repair the same. The difference in language with respect to the dam and that with respect to the raceway is of importance in this case. The right conferred and reserved was to repair or rebuild the dam; the right of each party with respect to the raceway was to repair or enlarge the raceway.

By a deed dated July 24th, 1873, the Newbrough company conveyed to Rosenthal and Strauss the tract of land on which the upper mill had been erected, containing about fifteen acres. The description in the deed was of the plot of ground on which the buildings of the Butler Hard Rubber Company are situate, and also the strip of land on which the raceway was situate, extending up the river to a point distant seven and five-tenths feet from the southwest corner of the stone abutment at the gatehouse at the upper end of the canal, marked "F" on the map: "Beginning, &c., together with all the rights of the dam and of all flowage possessed by the said party of the first part, subject, however, in all respects to all the joint rights, privileges, easements, conditions and covenants affecting the dam, the canal and the water in the Pequannock river, as expressed and contained in a certain

deed of conveyance executed and delivered by the said party of the first part to Richard B. Tyndall, and bearing date the 12th day of February, 1873.  *  *  *  Also subject to the right of the railway company to take the water from the canal to the tank for the supply of their locomotives and engines, the conduits or watercourses which may be erected for that purpose to be maintained at the cost and expense of the said railway company and in such manner as not to damage the canal.  The said party of the first part reserving, however, the right to build and erect a dam across the said Pequannock river at such a point as the said party of the first part may hereafter determine, and above the railway bridge as the same is now located, and also the right to flow the land on the southerly side of the said river to within five feet from the top of the dam as now located, together with all and singular the houses, buildings and all the rubber machinery and mechanics' tools now in said buildings, trees, ways, waters, profits, privileges and advantages, with the appurtenances to the same belonging or in any wise appertaining, subject as aforesaid ; also, all the estate, right, title, interest, property, claim and demand whatsoever of the said party of the first part of, in and to the same and of, in and to every part and parcel thereof except as aforesaid." The Butler Hard Rubber Company are the owners of the title of Rosenthal and Strauss which the latter acquired by this deed.

When the Newbrough company conveyed the Tyndall mill, that company remained the owner of the upper mill.  Looking merely at the covenants and conditions in the Tyndall deed, the Newbrough company had in common with Tyndall the right to repair or rebuild the dam and to repair and enlarge the raceway.  But the rights of the Newbrough company were not limited by the prescriptions in the Tyndall deed. The company remained the owner in fee of the upper mill and of the raceway, dam and water-power, with all the right to alter and enlarge that belonged to the owner of the fee ; provided, only, that in making such changes the rights of

Tyndall should not be impaired. The raceway was widened in 1880, so far as it appears, by the consent of the owners of the Tyndall mill, and no alteration in the raceway by widening it could possibly be regarded as impairing any right of the owners of the Tyndall property. In the deed by the Newbrough company to Rosenthal and Strauss all the rights of the Newbrough company were conveyed without qualification or restriction except that the conveyance was subject to the right of the railway company to take water from the canal to their tank for supplying their locomotives and engines.

The contention of the defendants is that Rosenthal and Strauss were deprived of the right to enlarge the raceway, and restricted to its venting capacity, as it was in 1873, by the provision contained in their deed which allowed the Newbrough company to build and erect a dam across the river, below the dam that was on the premises in 1873, and to flow the lands granted to Rosenthal and Strauss to within five feet from the top of the dam. The conveyance by the Newbrough company to Rosenthal and Strauss was expressly of " all the rights of the dam and of all the flowage possessed by the said party of the first part," subject only to the conditions and covenants affecting the dam and raceway and the water contained in the Tyndall deed, and the right of the railway company to take water from the canal to the tank to supply their locomotives. In virtue of these conveyances and of the stipulations contained therein, the right of Rosenthal and Strauss and those who succeeded to their title to widen and enlarge the raceway is undoubted. The Newbrough company, in virtue of the right reserved to erect a dam below the dam conveyed to Rosenthal and Strauss indicated no purpose to interfere with the waters or water rights of either the owners of the Butler mill or the owners of the Tyndall mill. The dam in question was never built, and, if built, would only be available to receive the water which might be discharged over the dam. If there was any doubt as to the construction of this deed, the rule of construction that the terms of the grant should be construed most strongly against the grantor will

resolve this question in favor of the grantee. The widening of the race was made in 1880, presumably with the consent, if not concurrence, of the owner of the Tyndall property. At all events, the raceway was widened before these proceedings were commenced. Having been done lawfully, the water company, in the condemnation proceedings, must take the premises as they were when the proceedings commenced, and compensation must be made accordingly.

The other two subdivisions embraced in this question (*a* and *b*) can be answered shortly. The plaintiffs had no right to use the water from the raceway and flume for any other purposes than power, nor a right to arrest the flow of the water through the raceway in its progress down to the Tyndall property, except as such an interference with the flow of water or its use was justified by the Tyndall deed. But the remedy for the invasion of any right of Tyndall's would be by action, or some proceeding by the owners of the Tyndall property to restore the delivery of the water from the tailrace in the manner stipulated for in the Tyndall deed. There was evidence tending to show that the plaintiffs, by means of a six-inch pipe, had carried from the headrace water for use for mechanical purposes in the mill, not as water-power. If this use of the water interfered with the right of Tyndall, the redress for such an injury would be by suit by Tyndall or those who succeeded to his estate. Admitting that the acts of the plaintiffs in this respect were unlawful, and the company made itself liable to an action at the suit of the owners of the Tyndall mill, such an unlawful act did not carry with it the forfeiture of the plaintiffs' rights in their water-power. The plaintiffs had been accustomed to close the gates leading to their mill in order to allow the raceway to fill up, thereby arresting the flow of the water and increasing the power derived therefrom in their mill. This custom was not objected to by the owners of the Tyndall mill, probably because it was for the advantage of both parties in storing water for use in both mills. The deed to Tyndall authorized the grantee to construct a side channel or flume from the raceway to the tailrace,

and to maintain the same—not to the unnecessary injury of the upper mill. The deed contained the further provision that this side channel should be built under the supervision of the Newbrough company, its successors and assigns, and that they should cause and allow the water of the said raceway and river to flow freely at all times, either through the side channel or through the said mill into the tailrace, with a proviso that the water should not be taken from the headrace so as to interfere with the use of the upper mill, or to unnecessarily impair the value of the premises of the Newbrough company as a manufacturing property. Having regard to the relative situation of the two mill properties, and the fact that the owners of the Tyndall mill had primarily a right to the use of the water only after it had been utilized for waterpower at the upper mill, and that the restriction in the deed that the water so taken by the side flume should not interfere with the use of the upper mill or unnecessarily impair the value of the property, the reservation of such a right did not seriously affect the value of the water-power for the upper mill. Its effect was mainly to prohibit the plaintiffs from discontinuing the use of the raceway as a means of carrying the water that is left after the amount taken by the city is abstracted from the river to the site of the Tyndall mill. The attention of the jury was called to the situation of the title, and it was no doubt properly appreciated by them.

The third and fourth questions certified will be considered together. They are as follows :

" 3. Should the jury have been instructed that the evidence of the cost of installing and maintaining and substituting a steam plant with which to run machinery heretofore operated by water-power, was competent as a means of arriving at or determining the difference in market value of the property on account of the diversion, according to the terms of the charge ?

" 4. Should the jury have been allowed, in estimating the difference in market value of the plaintiffs' property by reason of the diversion, to consider the theory of supplying the power by other means, as directed by the court in the charge ? "

The trial judge instructed the jury that for the purpose of ascertaining what is just compensation the law had established the legal rule that if the whole property be taken, the market value of the property, as between an owner willing to sell and a purchaser desiring to buy, was the measure of compensation. " If part only be taken, or, in the language of the act, the property be ' affected' by the operation of the works for which property is taken, then the problem is this : The difference between the value of the property before it was taken or interfered with and the value that remains in the property after the injury is done, market values in both instances being determined on the basis of what, in the judgment of the jury, the property under either circumstances would bring in the market as between a purchaser desiring to buy and an owner willing to sell. In proceeding with this investigation the commencement of the inquiry, the foundation on which your verdict is to be constructed, is the market value of this property before this water was diverted, the market value that would, in the judgment of the jury, under the evidence, have been realized by a sale of this property if the owner had put it in the market, desiring to sell it, and effected a sale to a purchaser willing to buy. That proposition must be decided by the evidence in this case, qualified, of course, and modified by the result of your own view and your observation of the premises. When you have ascertained that—that is, the market value of the property before these works were constructed—you commence the construction of a verdict on the principle I have already stated, the comparison of market values before and after. The sum arrived at cannot be more than the market value of the premises, and if part only is taken it will be less, if that which is left possesses any market value."

The trial judge then referred to the extent and efficiency of the water-power when the proceedings to condemn were taken. " The plaintiffs, at that time, had two wheels, a thirty-six-inch wheel, with a ventage of twenty-four millions of gallons in twenty-four hours, and a forty-three-inch wheel,

with a ventage of forty-three millions of gallons, making an aggregate ventage capacity for twenty-four hours of sixty-seven million gallons of water. There is evidence that the stream, in its natural state, is subject to fluctuations occasioned by high water and drought and also subject to interference because of ice, and there is no evidence that the water-supply was adequate to drive both or either of these wheels throughout the year. The highest estimate that I recall from the evidence is an estimate that the forty-three-inch wheel could be run from ten to ten and a half months in the year, and the thirty-six-inch wheel for a much less time, and the evidence on the part of the plaintiffs is that for a considerable portion of the year the water-supply was not such as would enable them to run both of these wheels with a full head. There is other evidence in the case, a great deal of it on both sides, with regard to the capacity not of the machinery, but of the water-supply, to furnish the power necessary to drive these wheels."

After referring to the evidence with respect to the changes in the water-power from 1869 to 1872, the trial judge said : " Now, gentlemen, when you have ascertained the extent and the value of the plaintiffs' water-power before the diversion, then you advance another step, and that is to ascertain the extent to which the plaintiffs' property was, in the language of the statute, ' affected ' by the diversion of this water ; in other words, the nature and extent of the injury done, and the character and value of what was left. In order to determine that question, the first consideration is the extent of the legal right acquired by the city in these condemnation proceedings. What have they taken, and what have they a right to take ? In order to answer that question, we go back to the issue that is made in this case, and I read this extract : ' The petitioners [that is, the city] limited and restricted their application for their right to condemn to take in such proceedings, as follows : the right to divert and take from the Pequannock river, at the dam of the Macopin intake reservoir, as now located and constructed, as shown on the map produced, so much water as

will be sufficient to furnish the said city with fifty millions of gallons of water each and every day.' That is what the city proposes to take, and that is what, by your verdict, it will acquire a right to take; and whether it uses all of this water or not is a matter, on this branch of the case, of no importance. * * * When you ascertain how much the legal right of the city to the use and appropriation of this water, in its exercise, would affect the power that is left, then decide for yourselves the value of the remaining power, bearing in mind that the city takes only water rights, and leaves everything else in the possession and enjoyment of the owner. And when you have done that, subtract that from the market value of the property before it was interfered with, and you have got your verdict. * * * The legal proposition (the difference in market values) cannot be set aside; but how that legal proposition is to be ascertained, by what methods and by what evidence, depends on the situation of the particular case. * * * There is evidence of sales of water-power on this stream, reflecting on the value of this water-power considered simply as a water-power, unimproved at the time this diversion took place. That evidence you are by no means to reject. You are to give it such effect, with regard to the market value of this property, as it ought to have; bearing in mind that this water-power has been improved, and that the abandonment of this whole plant has not been suggested as a reasonable course to adopt.

"The theory on which this case has been presented, and on which I propose to present it, is that of supplying by other means the power which is taken away by the diversion of this water."

The evidence shows that after 1873 the mill on the plaintiffs' premises had been very much enlarged, and new and expensive machinery, not only for manufacturing purposes, but for additional power, had been set up, increasing the market value of the plaintiffs' premises, independent of the water-power, until it reached a large sum. In 1895, a double-cylinder Corliss engine rated at five hundred horse-power was set up for use in driving machinery, part of which had been

driven by water-power before that time. The contention on
the part of the city was that if the five-hundred horse-power
engine was compounded, enough power might be obtained in
that way for driving all of the defendants' machinery after the
fifty millions of gallons of water a day had been abstracted.
The other method suggested was by the installation of a sepa-
rate plant for the purpose of supplying additional power.
The trial judge instructed the jury : "That method of re-
adjustment is one for your consideration. If you find, as the
result of the evidence, that that is the proper way for re-
adjusting this establishment, with a view of restoring what
has been lost by the diversion of the water, then the cost of
that method of reconstruction will furnish you with the means
of deciding, on the legal rule, the difference in market value.
* * * Which method, gentlemen, would a judicious owner
adopt to meet the diminution in his power by reason of the
diversion of the quantity of water taken by the city under
these proceedings ? Would he make a connection with the
engine that is there, or would he install a new plant for the
purpose of driving the machinery on that line of shafting ?
When you determine that, then the cost (and when I speak
of cost, I don't confine it wholly to first cost, as you will see
presently) of furnishing that supply will be used, not for the
purpose of figuring out a verdict, but as a means of deciding
on just compensation—bearing in mind that while the plaint-
iffs are entitled to compensation which would restore what
they have lost, they are not entitled to have their property
improved beyond its original value by means of a proceeding
of this character. * * * The plaintiffs are entitled to just
compensation. And I use that word 'just' in a double
sense—in the first place, just, in the sense of fairness ; and in
the next place, just, in the sense of limitation—*just* compen-
sation. In the second place, they are not entitled to have
their property made more valuable in the market than it was
before the condemnation was made ; they are entitled to just
compensation, nothing less, nothing more." Speaking of the
utilization of the five-hundred horse-power engine by com-
pounding it, the trial judge said : "As I understand the evi-

dence, and I believe that is the case, the compounding of an engine doesn't increase its efficiency; it simply saves fuel. If that method of reconstructing these premises to meet the altered condition of affairs meets the approbation of the jury, make compensation on the basis of such a readjustment. You ought to allow the plaintiffs the amount of the cost of that five-hundred horse-power engine, in comparison with the amount of work that was done by that engine elsewhere and the amount of work required to be done there." This instruction was obviously correct. The plaintiffs were the owners of the five-hundred horse-power engine provided by them for present as well as for future use in their works. When these condemnation proceedings were had, they had their water-power, and they had also, in addition to the power derived from the stream, the five-hundred horse-power engine. Both these sources of power the plaintiffs owned, with the right to use both in the present or in the future, as circumstances might require. If that engine be utilized in driving machinery which was made destitute of power by the diversion of this stream, to that extent the capacity of the plaintiffs' plant, made up of the five-hundred horse-power engine and the water-power as it was originally, would be impaired. If a trespasser should have entered on the plaintiffs' property and removed the engine, the fact that the company could, by changing its gearing, repair the loss in whole or in part by a readjustment of its water-power would not, in a suit for taking the plaintiffs' property, either be an answer to the suit or mitigate the damages. The jury was instructed that if the method of reconstructing the premises by compounding the five-hundred horse-power engine met the approbation of the jury, they should make compensation on the basis of such a readjustment, but that the jury in that event should allow the plaintiffs' the cost of the five-hundred horse-power engine, in comparison with the amount of work that was done by that engine elsewhere, and the amount of work to be done there. These instructions were correct.

A certificate in conformity with this opinion will be sent to the Circuit Court.