63  605
r65  711

HENRY W. DOREMUS et al.

*v.*

THE MAYOR AND ALDERMEN OF THE CITY OF PATERSON.

[Filed September 8th, 1902.]

1. In an action by the owners of a dam and water-power for compensation for the pollution of the water by the sewage of a city, where the dam has been maintained at its present height for forty years, so that adverse

claimants are barred, and was built at a point where its construction was or might have been lawful, it cannot be assumed, in the absence of evidence, that the dam is unlawful.

2. A water-power company was authorized by the legislature to buy and hold land and water-power for manufacturing purposes, and to sell, let or otherwise dispose thereof as it should deem proper. It constructed a dam and executed leases of mill power, granting to each lessee the right to draw a specified amount of water from the nearest raceway or canal.— *Held*, that the water rights acquired by such lessees were property of which they could not constitutionally be deprived without compensation, whether they were owners or lessees of lands bordering on the stream or not.

3. Where the owner of a dam and water-power executed leases, granting to each lessee the right to draw a specified quantity of water from the nearest raceway or canal, so long as the water in the main reservoir should stand at a specified height, and providing that if the water should fall below such height, the gates of the lessees should be shut off in the reverse order of their numbers until the height of the water was restored—*Held*, that lessor and lessee were properly joined as parties complainant on a bill filed against the city.

On demurrer.

*Mr. Sherrerd Depue,* for the complainants.

*Mr. George S. Hilton,* for the defendants.

STEVENS, V. C.

This is a demurrer to a bill filed by the complainants, who are either riparian owners of land on the Passaic river, above the ebb and flow of the tide, or lessees of riparian owners. The complainants pray for an injunction restraining the pollution of the river by sewage, unless the city will make "such compensation for the diminution in the value of their land and property rights as shall be ascertained by this honorable court to be just." The bill, though a new one, is practically a continuation of the case of *Simmons* v. *Paterson, 13 Dick. Ch. Rep. 1; on appeal, 15 Dick. Ch. Rep. 385,* and is based upon the complainants' view of the scope of the decision of the court of appeals in that case.

As several of the causes of demurrer have been disposed of by that decision, only two seem to me to require discussion at this time.

Doremus *v.* Mayor, &c., of City of Paterson.

It is said that the Dundee company and those who hold under it are not entitled to the relief prayed for, because the company's dam is an unlawful structure, and its continuance as such gives rise to the very evils which are made the basis of complaint. It is only necessary to say, in answer to this, that it does not appear from the allegations of the bill that it is an unlawful structure. The dam was erected shortly after the year 1832. In 1858 it was raised to a height of fourteen feet above the river bed, and it has been maintained at that height ever since. Even if it could be inferred from the allegation of the bill that it was built upon lands which did not belong to the company, and there is nothing in the bill from which such an inference can be made, it has stood at its present height for over forty years—a period of time more than sufficient to legalize it as against adverse claimants. It was constructed at a point where the title to the bed of the stream was, or might have been, in the company, and where the construction was, or might have been, lawful. I cannot assume, in the absence of evidence, that it was unlawful.

The other cause of demurrer requiring present consideration is that some of the complainants are not riparian owners, and therefore not entitled to damage or an injunction. *Stockport Water Works Co.* v. *Potter, 3 Hurlst. & C. 300,* is relied upon. The bill includes three classes of persons—*first,* those who are, in the fullest sense, riparian owners above the ebb and flow of the tide; *second,* those whose lands adjoin, not the river, but the artificially constructed canal whose waters are drawn from the river; *third,* those who are neither owners nor lessees of lands fronting on the river or on the canal, but who are lessees of a certain amount of "mill power," which is used in their respective factories, either for driving the machinery or for scouring, dyeing, &c.

As to the first class, there can be no doubt that its members are entitled to an injunction or damages, under the decision in *Simmons* v. *Paterson.*

The second and third classes resemble each other in this respect, viz., that they both lease mill power.

Mill power is, in the leases, defined to be

"the right to draw from the nearest raceway or canal of the lessors
through the land to be demised and to be used thereon eight and one-half
cubic feet of water per second so long as the water in the main reservoir
at the dam shall stand within twelve inches below the level of the top of
said dam with a free flow therefrom and the main canal or raceway, all
the inlet gates to the same being open, with a fall not exceeding a point
23 feet below the level of the top of the dam."

There is a restriction that, in case the water in the main
reservoir shall fall below the point designated as twelve inches
below the level of the top of the dam, the lessors shall shut down
the gates of the lessees, in the reverse order of their numbers,
sufficient to maintain the water in the main reservoir at the
said point.

It will be unnecessary, for the purposes of this discussion, to
differentiate the second of the above classes from the third, be-
cause I think that, under the law of this state, as I understand
it, both classes may, because they are lessees of mill power, di-
rectly or indirectly, participate in the benefit of this suit.

In *Stockport Water Works Co.* v. *Potter, supra,* it was
held, by a divided court, that where a riparian proprietor con-
veys land not abutting on a stream and grants water rights
to be used thereon, the grant of water rights, though valid as
against the grantor, creates no rights for the interruption of
which the grantee can sue a third party. This case was con-
sidered by the supreme court, in *Butler Rubber Co.* v. *Newark,
32 Vr. 32,* and there distinguished. It was held that on the
assumption that the grantee of the right to take water for the
purpose of its mill was not, under its deed, a riparian proprietor,
still it was entitled to compensation for the damages it sus-
tained by the taking of the water of the Pequannock, for the
benefit of the city of Newark, under proceedings to condemn.
Mr. Justice Depue said: "The right the plaintiffs obtained to
the use of the waters of the stream, in virtue of the grant from
the Newbrough company, is undeniably property. As such, un-
der our constitution, they cannot be deprived of it, except on
compensation made. This principle applies whether the water
taken or the injury done to the mill property by diverting the

waters from the mill be considered.   The destruction of private
property, either total or partial, *or the diminution of its value,*
by the act of the governments directly and not merely inci-
·dentally affecting it, is·a taking, within the constitutional pro-
vision, which can be effected only under the right of eminent
domain, subject ·to the constitutional limitation of making just
compensation."

In *Kensit* v. *Great Eastern Railroad Co., 27 Ch. Div. 136,*
Lord-Justice Lindley, speaking of the *Stockport Water Works
Co. Case,* says: "It simply decides that the grantee, if a riparian
proprietor, must take the water as he finds it.   If it is dirty when
it comes to the mouth of his pipe, he cannot complain of those
who have dirtied it.   He has not the right of a riparian pro-
prietor.   The case does not decide that the licensee or grantee
of a riparian proprietor cannot take some water from the stream
if he hurts nobody.   *   *   *   The argument cannot be main-
tained unless we say that a riparian proprietor cannot allow
anybody to take any water out of a stream whether anybody is
injured or not.   It seems to me it would be monstrous to decide
anything of the sort."   Even in the *Stockport Water Works Co.
Case* it is admitted that the non-riparian grantee can acquire
water rights good as against the grantor, "but not so as to sue
other persons, in his own name, for the infringement of them."

Now, what is the *status* of the present case?   It is, in form,
a suit in the alternative for an injunction or the just compensa-
tion guaranteed by the constitution. · But, in *Simmons* v. *Pater-
son, 15 Dick. Ch. Rep. 393,* it was held by the court of appeals
that the complainants were, by reason of their continued acqui-
escence, not entitled to an injunction if relief could be otherwise
afforded, and that relief could be afforded by making to them
"such compensation for the diminution of the value of their
lands as should be ascertained to be just."   The suit is therefore,
substantially, a suit for compensation for property taken, and
the question is have the lessees of water-power a property right
therein.   If they have such a right, and it is diminished in value
by the act of the city of Paterson, that is a taking, within the
meaning of the constitutional provision, and they are entitled to
damages.   I think they have such a right.

The dam, as I have said, is, so far as appears, a lawful structure. It was erected by the Dundee Manufacturing Company shortly after the year 1832. By its charter, granted in that year and amended in the year following, the legislature authorized the company to buy, rent and hold lands, tenements and *water-power* necessary and useful for the purpose of manufacturing iron, cotton, wool and other articles, and the same *"to sell, let or otherwise dispose of as they should deem proper."* Again, in 1872, the legislature enacted that the reorganized company might establish an office in the city of New York, *"for the letting of its power* or the disposal of its lands or for any other purpose."* Here, then, was an express authorization, by the legislature, to let power. Now, of course, the legislature did not intend to authorize, and could not have authorized, the letting of power in such manner as to deprive the lower riparian owners of their right to the flow of the stream. What that right is, is clearly stated in a passage, often quoted, from a judgment of Lord Kingsdown in *Minor* v. *Gilmour, 12 Moo. P. C. C. 156.* He says: "By the general law applicable to running streams every riparian proprietor has a right to what may be called the ordinary use of water flowing past his land; for instance, to the reasonable use of the water for domestic purposes and for his cattle, and this without regard to the effect which such use may have, in case of a deficiency, upon proprietors lower down the stream. But further, he has the right to the use of it for any purposes or what may be deemed the extraordinary use of it, provided he does not thereby interfere with the right of other proprietors either above or below him. Subject to this condition, he may dam up a stream for the purpose of a mill or divert the water for the purpose of irrigation. But he has no right to intercept the regular flow of the stream, if he thereby interferes with the lawful use of the water by other proprietors and inflicts upon them a sensible injury." This I understand to be the doctrine of *Higgins* v. *Flemington Water Works Co., 9 Stew. Eq. 538.*

The Dundee company, in virtue of its riparian ownership, had, as it appears from this passage, the right to dam, and the further right to use the water of the river for milling purposes, if such did not interfere with its lawful use by other proprietors.

It might, by adverse possession, or by contract with lower proprietors, have acquired a greater right. *Holsman* v. *Boiling Springs Bleaching Co., 1 McCart. 336.*

But the Dundee company, by legislative enactment, had this further right, viz., a right to *let* water-power—not a right to let more water-power than it could lawfully use itself, but, I take it, as much as it could lawfully use. The right to thus let was not, in terms, a restricted right—a right to let to those only who were or might become riparian owners. It was a general right. Being general, some reason for cutting it down must be shown. But, in point of fact, the public is benefited by the full utilization of one of nature's forces, and, because of the limitation mentioned in the judgment of Lord Kingsdown, no other person's right is or can be interfered with. Assuming, then, that the law as it was declared in the *Stockport Water Works Co. Case* is the law of this state, that case cannot be regarded as controlling, for the case at bar has been taken out of its operation. Certainly it will not be asserted that the legislature may not authorize the transfer of rights in gross to water-power, even if, at common law, such transfer, though valid and enforceable in some respect, is not so in others. The legislature has made choses in action and transfers of estates in expectancy assignable. It has enabled grantees of reversions and lessees to avail themselves of covenants and conditions in leases, and I can see no reason why, if water rights in gross cannot, by the rules of the common law, be effectually assigned, the legislature could not have made them assignable. It would seem, therefore, to be quite inadmissible to assert that when the legislature declared that the company might let and rent water-power, they did not intend to vest in the lessee the right of the lessor to the extent that he possessed and conferred it.

Now, I cannot imagine that when the legislature authorized a letting, it intended that the lessee of the thing demised should have every other right of property in it except the right to prevent its pollution—that is, its partial or complete destruction for all the beneficial purposes of the lease. Says Mr. Justice Van Syckel, in *Simmons* v. *Paterson, supra:* "The higher owners cannot lawfully combine and, by construction of artificial

conduits, collect foul matter and pour it, in mass, into the stream. Such a scheme, when put into operation, constitutes the taking of private property, which the legislature cannot authorize, except upon just compensation to the party injured."

We have, then, this situation: A legislative grant to the Dundee company of a right to acquire and use power; a legislative grant of a further right to let and rent power; an adjudication in the *Butler Rubber Co. Case* that a right in gross to water is a property right, for which, if taken for municipal use, compensation must be made; and a declaration in the *Simmons Case* that pollution is such an injury as constitutes a taking, within the meaning of the constitution. This grant and these decisions seem to me to take the case out of the operation of the *Stockport Water Works Co. Case,* if that case be law here.

The further point is made that the lessees of power cannot be joined in the same bill with riparian owners properly so denominated. This objection seems to be without substance. Assuming that Rule 132 does not apply, it seems clear that the present case comes within the reason of the late chancellor's opinion, with the decisions cited and commented on by him, in the *Simmons Case,* reported under the name of *Attorney-General v. Paterson, 12 Dick. Ch. Rep. 1.* No disapproval of his views in that respect is to be found in the opinion delivered on behalf of the court of review. I may add that, as the bill now stands, Rule 130 clearly applies to those who are riparian owners. If it does not apply to lessees of water-power, because such lessees do not own or possess "distinct *tenements,*" it would seem, from the clauses of the leases, to which I have already referred, that there is, to a certain extent, a community of interest or obligation among the several lessees when the water is low, which makes it at least desirable that both lessor and lessees should participate in an assessment of damages.