THE SPARKS MANUFACTURING COMPANY

*v.*

THE TOWN OF NEWTON et al.

WORTHINGTON H. INGERSOLL

*v.*

THE TOWN OF NEWTON et al.

[Decided October 21st, 1898. Filed June 10th, 1899.]

1. Where a riparian proprietor seeks the aid of a court of equity to restrain a corporation from diverting water for public purposes, which it has the power to condemn, and the corporation offers to pay such sum as the court shall deem to be just compensation, and complainant consents, the court has jurisdiction to ascertain the amount of such compensation.

2. A municipality which buys a piece of land on a stream several miles from its corporate limits does not thereby become a riparian owner and entitled as such to use the water of the stream to supply its inhabitants.

3. A riparian owner who constructs a storage reservoir on a stream and uses it for more than twenty years for the benefit of his mill on the stream, and thereby confers an incidental benefit on millowners further down the stream, does not thereby invest such down-stream millowners with a right to have the benefit of such storage, but may at any time discontinue its use and allow the reservoir to fall into disrepair.

4. The legislature of this state does not possess, and has not attempted to exercise, the power of authorizing the diversion of water from running streams upon condition of making compensation by storing storm and flood water and giving it out in dry times for the benefit of the riparian owners as compensation for the diversion.

5. Storm or flood water, as soon as it reaches a natural stream, loses the character of surface water and becomes a part of the stream and subject to the right of use by all riparian proprietors, and cannot be diverted against the will of such proprietors except by the exercise of the eminent domain.

6. A water-power millowner, who had for many years owned and controlled a storage reservoir for the benefit of his mill in dry weather, thereby incidentally benefiting other down-stream millowners, conveyed to a municipality the reservoir and a right to divert water therefrom, taking from it a

covenant to deliver to him from it the same (undefined) quantity of water which he had previously been accustomed to draw. The municipality increased the capacity of the reservoir and claimed the right to divert a certain quantity of water from it for the use of its inhabitants within its corporate limits whose natural drainage was into a different stream, and justified its diversion as against riparian millowners below the first-mentioned owner and grantor of the reservoir, on the ground that the effect of its operation would be to increase and benefit rather than diminish and injure the water power below by storing flood and storm water of no use or value to the millowners.— *Held*, no defence to a bill by the lower millowners, for the reasons : (1) That they were not subrogated to the contract rights of the former owner and grantor of the reservoir, who was at liberty at any time to suspend the exercise of his rights against the municipality and also to release the same. (2) There was not, and in the nature of the case could not be, any standard by which to gauge the contract rights of the covenantee. (3) The diversion would result in an actual diminution in the amount of water annually flowing by the lower millowners' land. (4) There was no legal certainty that the water diverted would consist actually or in effect of flood and storm water which would ordinarily be of no value to the millowners.

7. Principles upon which compensation in such case should be ascertained discussed and applied to the case in hand.

The two causes heard together, by consent.

The complainants are each the owner of a tract of land situate on the Wallkill river, at Hamburg, in the county of Sussex, with mills thereon operated by the developed power of the fall of that stream ; and by their respective bills, filed December 28th, 1895, they complain that the town of Newton, through its commissioners for that purpose (who are defendants), by works erected during that year, diverted a portion of the waters of that river and proposed to divert more thereof for the purpose of supplying the town of Newton not only with water for ordinary domestic uses and for the extinguishment of fires, but also to be let out and used as power for mechanical purposes ; and they severally pray that the defendants may be enjoined from further diverting or diminishing the waters of the Wallkill until they shall have made compensation to the complainants in the manner provided by law for the injury caused and to be caused by means of such diversion and diminution, and that they may be perpetually enjoined from taking, diverting, using or selling any

of such waters for manufacturing purposes or for any other purpose except for the extinguishment of fires and for domestic consumption, and for such other specific uses as this court shall deem to be strictly public uses; and that a decree may be made ascertaining what amount will be equitable and just to be paid to the complainants as compensation for the amount to be diverted for such public use and requiring the same to be paid by the defendant corporation, expressly submitting themselves by their bills to the jurisdiction of the court, and consenting and agreeing to take such compensation as the court may cause to be ascertained and fixed in such manner as it may deem proper.

The defendant the town of Newton (the commissioners may be dismissed from consideration), by its answers, admits the construction of the water works, and its intention to divert a quantity of water from the Wallkill river, and to use it as well for domestic uses and the extinguishment of fires as for mechanical purposes, but alleges that it has expended a large sum of money in the erection of a retaining dam across a branch of the Wallkill and the creation thereby of a water-storage reservoir which will receive and save up freshet and flood water in wet seasons, which would otherwise run to waste, in a quantity more than sufficient to supply the town of Newton during the dry season of the year, and that the result of the operation of its works will be that no injury will be inflicted upon the complainants, and that for that reason the complainants have no standing in a court of equity.

The defendant further, by its answers, admits that this court has full and entire jurisdiction of the causes and of ascertaining what compensation the complainants are entitled to, if any, and thereby submits itself to the jurisdiction of the court and to its ascertainment of said compensation.

The answers are drawn out at great length, but the foregoing brief statement is sufficient for an understanding of the general aspect of the case.

At the hearing the jurisdiction of the court was invoked by all parties to ascertain the amount of compensation which should be paid by the defendant to the complainants severally, if the

court should be of opinion that the defendant's main defence was not sustained.

A large amount of evidence, including that of experts, was taken, occupying seven full days in its production, and the causes were fully discussed, both orally and in elaborate printed arguments.

*Mr. William H. Corbin*, for the complainants.

*Mr. Lewis Van Blarcom* and *Mr. Thomas Kays*, for the defendant.

PITNEY, V. C.

The defendant, by its answers, sets up and claims the right to divert all the water which its works as actually constructed are capable of diverting. That amount was, during the hearing, at first agreed upon as one million two hundred and fifty thousand gallons in twenty-four hours. But that estimate was based upon the flow due to a head produced by an open pipe at the level of the court-house in Newton; and when it was pointed out that such use of the pipe would leave a large portion— nearly, if not quite, one-half of the town which is situate on ground higher than the court-house—unsupplied with water, the defendant applied for and obtained leave to limit itself to a diversion of eight hundred thousand gallons a day, which, subject to some further remarks upon the question of quantity, I shall, for present purposes, consider the amount to be diverted.

And it is to be remarked, in the first place, that that amount is carried entirely out of the valley of the Wallkill river, which runs from a point three or four miles east of Newton, in a nearly direct line, northeasterly, to and through the county of Orange, in the State of New York, and reaches the Hudson river at or near Kingston; while the town of Newton is situate on the headwaters of the Paulins Kill, which flows to the Delaware, and all its drainage finds its way into that stream and none of it into the Wallkill. So that the diversion is total, and the case is not involved with the very nice question which might arise

Sparks Manufacturing Co. v. Town of Newton.

if the drainage of the town were in the valley of the Wallkill, since it is a notorious fact that, under ordinary circumstances, a large portion, and, where a town or city has a system of sewerage, nearly the whole of the water consumed finds its way back into a running stream.

Upon this state of the case there can be no doubt of the duty and power of this court to intervene to prevent such a diversion of water until just compensation shall be made, unless the particular defence or defences set up by the defendant are sufficient to answer the complainants' equity in that respect.

In the case of *Higgins* v. *Flemington Water Co., 9 Stew. Eq. 538*, the total amount proposed to be diverted, or which by the pumping machinery in use for that purpose could be diverted, from the Raritan river, was clearly shown to be six thousand one hundred and fifty cubic feet, or forty-six thousand one hundred and eighty-five gallons in one day of ten hours, and the proposition was to pump for three days in a week during the dry season; and the Raritan river, at the point of diversion, was a much greater stream than the Wallkill at Hamburg. The amount so proposed to be diverted in that case was one-sixteenth of the amount here proposed to be diverted, or, if taken only three days in a week, then only one thirty-second of the amount, and it was shown that if all that was proposed to be taken for a whole season were collected together and used in a body on complainant's wheel it would grind less than twenty bushels of corn, the head and fall of the complainant's power in that case being not more than five or six feet, or one-quarter of the fall here. (I take these figures from the printed book in that case.) Yet the chief-justice, in the face of these facts (at *p. 541*), uses this language: " The facts which must be taken as established are these: The complainants' property is situated on the south branch of the Raritan river, which is a stream of considerable volume except in times of drought; the defendant is a corporate body, constituted for the purpose of supplying the village of Flemington with water, and to that end, finding its supply of water from other sources insufficient, contracted with the owners of a mill on the stream in question to pump from such stream,

at a point above the premises of the complainants, and to force through pipes into its reservoir, such a quantity of water as would form the complement of its resources. This supplementary supply was necessary only in times of scarcity of water, and at such times the natural stream, if left undiminished, was insufficient for the purposes of the complainants; and the *quantum* which would be thus abstracted by the defendant, though not very great, *would be of such magnitude as to work a sensible and essential detriment to the complainants, and would therefore be of a character that its abstraction cannot be disregarded by force of the maxim de minimis,"* &c.

There was, in that case, in addition to the comparative smallness of the diversion, the additional element that the town was situate on the banks of a small stream known as Bushkill brook, which emptied into the river above the complainants' mills, and the drainage from the town found its way into that brook and so to the complainants' mill-pond, so that the actual diversion was very small. No proof, however, was given by any expert of the proportion of the amount consumed by the inhabitants which found its way by natural causes into the river, and that element of the case, though pressed in the argument, was undoubtedly left for consideration by the court of chancery in settling the terms and extent of the injunction, as stated at the end of the opinion (at *p. 547*).

With this precedent before me, together with many others cited by counsel for the complainants, not necessary here to be mentioned, it is impossible for me to escape the duty of granting relief to the complainants unless the defence set up has strength and virtue.

In order to do full justice to the ingenious and elaborate defence set up and pressed at much length and with great earnestness and power, it is necessary to state the facts and discuss the law involved with some considerable prolixity.

The Wallkill river proper is formed at the northerly and down-stream end of the village of Sparta, in the county of Sussex, by the union of two or three other streams, the more westerly of which is called the Wallkill, and rises in what is known

as the Brogden meadows, and is sufficient of itself, with a large head and fall, to drive, for most of the time, a small gristmill, known as Hurd's mill, in the southern part of the village. Then below Hurd's mill there comes in another stream from the southeast, known as the Lennington brook, and then a stream from a natural lake, known as Morris lake, situate on ground two or three hundred feet higher than Sparta and to the east of it. To the outpour from this lake is added a small brook called Pine Swamp brook, with a drainage area of two and fifty-five hundredths square miles. The result of these flows added to the two first mentioned forms the Wallkill proper.

Morris lake was originally a natural lake of considerable depth, covering about one hundred and thirty acres of land, fed mainly, as alleged by the answers and proven in the case, by springs, and having a drainage area of one and twenty-five hundredths square miles, including the surface of the lake itself. But the proof satisfies me that the natural flow from the lake in a drought is much greater than is due to such drainage area. Nearly a century ago a dam several feet high was thrown across its outlet by the owners of mills in the village of Sparta to increase its depth and form a storage reservoir from which they drew the water in dry times to supply the mills. Later, thirty years or more ago, a second dam was thrown across the gorge, a short distance below the lake, forming a pond, and was raised from time to time until it reached the level of the dam at the outlet of the lake proper, uniting the pond with the lake, and Pine Swamp brook, which in its natural course joined the outlet of the lake, was diverted and turned by an artificial channel into this artificial lake, below the old dam at the outlet of the old lake, so that the combined reservoir had a drainage area of about three and eighty-hundredths square miles. Gates were arranged in these dams, so that the owners of the mills below could and did obtain water to run their mills in the daytime by opening the gates in the morning and closing them at night, and this furnished a fine supply in dry weather.

The outlet of the lake and the land upon which the artificial

reservoir stood, and the gates of it, have been owned for many years by a Mr. Titman, who owns and operates, or did own and operate, a forge shortly below the reservoir, and has for many years owned, and still owns, a gristmill in the village of Sparta, which unites on its wheels the waters of all the streams mentioned. The proof is that in a dry time much the largest portion of the water used at Titman's mill came from Morris lake.

Another mill, shortly below that, was, and still is, owned by a Mr. Decker, and he naturally, and without any expense or trouble on his part, derived the benefit of the stored waters of the lake.

The distance from Decker's mill, in Sparta, to complainants' mills, at Hamburg, is seven miles in an air line and nearly twice that by the windings of the river, and between the tail-race of Decker's mill and the village of Franklin (two-thirds of the distance from Sparta to Hamburg), where there is a dam and pond across the Wallkill, the fall is only about seventy feet and the flow of the river comparatively quiet and sluggish, so that the water, as let down in the daytime from Titman's and Decker's mill, was spread over the whole twenty-four hours before it reached Hamburg. There is no doubt, however, that the result of the storage of water in Morris lake, as used by Titman, which, when full, covered upwards of one hundred and fifty acres of land, was a decided benefit to the water powers at Franklin and Hamburg.

The plan of the engineer who devised the Newton water works was, as shown by his report, to rebuild by solid stone work, and increase the height of, the dam across Morris lake proper by an addition of six and a half feet, thereby increasing its storage capacity by two hundred and sixty-one millions of gallons, and so arrange the work that two and a half feet additional in height could be obtained by the use of flash-boards, adding to the storage capacity one hundred and thirteen million additional gallons, or in all, three hundred and seventy-four million gallons, in addition to what will be absorbed by and stored in the earth and invisible cavities in the margin of the lake. The result will be to double its storage capacity. His plan also included the

deflection of Pine Swamp brook at a higher point in its course
and the turning of its water into the main lake and there storing
flood water, and out of such extra storage to supply the town
of Newton and to give to the millowners below, not specially
designated in the report but shown by the context to mean Mr.
Titman and Mr. Decker, the same flow from the lake in a dry
season that they had previously had. (This plan has been exe-
cuted.) It was, in short, a plan of compensation for diversion
by storing flood waters and letting them out in dry seasons.
And one question is whether that is lawful in this state.

As soon as this plan was made public, and before it had been
adopted by the town, or anything done towards executing it,
the complainants severally protested against it to the town
authorities as necessarily interfering with their right to the un-
interrupted flow of the river, and demanded compensation for
the contemplated diversion. The commissioners of the town,
who had the construction of the work in hand, deliberately de-
cided to ignore complainants' demand, upon the ground that the
works as planned would do them no actionable injury, and con-
tented themselves with dealing with Mr. Titman and another
owner of property at and near the outlet of the lake.

The defendant acquired by conveyance from Mr. Titman and
another proprietor certain lands and rights at the mouth of
Morris lake proper, but none in the artificial lake or pond imme-
diately below it; and in the deed from Mr. Titman it was ex-
pressed that the defendant should not, by the privilege thereby
granted of drawing off water from Morris lake in anywise inter-
fere with or delay, *hinder or disturb the usual flow of water from
said lake;* and the defendant agreed to so operate and manage
the new dam by it to be built at the outlet of said lake, and the
gates or sluices to be put therein, as to allow the waters of said
lake at all times thereafter to flow therefrom and therethrough
in quantities equal to the quantity of water *that had theretofore
flowed therefrom,* in the same direction that the same theretofore
flowed ; and the said Titman, his heirs and assigns should at all
times thereafter have the right and privilege to manage and
control the said waters *after the same flowed from the said lake*

at said dam, at such place and in such manner as they or either of them should elect or desire—that is to say, the town of Newton agreed with Titman to allow the same quantity of water to flow from the gates of the upper dam at the mouth of the lake proper as had previously flowed through them, and to allow Titman to use such water at his will and pleasure.

The answers in no place give or recognize any right on the part of the millowners at Hamburg, the complainants herein, to have any voice in the management of said gates or any right therein, nor did the defendant, by its counsel or otherwise at the hearing, offer to come under any legal obligation whatever to the complainants to draw the water from the reservoir at their instance and request.

But the answers declare that it is the *intention* of the defendant to let down water in dry seasons to compensate for the diversion, and the answers are framed and the defence put upon the assumption that such dispensation of water will be made.

It is here to be remarked that the complainants are not in anywise subrogated to the rights of Mr. Titman. The fact that he has, for more than twenty years, for his own benefit, maintained and operated the dam and gates at the outlet of Morris lake in such a manner as to confer an incidental benefit upon the mills at Hamburg, confers no legal right on the complainants as owners of those mills, as against Titman, to compel the continuance of that practice. This proposition seems to me too plain for argument, and needs no authority to support it, but such authority is abundant.

There is nothing in the case to show that either of the complainants has acquired the least right to the use or benefit of the works which Mr. Titman had erected and maintained at and just below the outlet. There is no proof of any actual grant of any such right to either, or that either has ever exercised it. Nobody on behalf of either has ever exercised the least right to manage or handle those gates, or done any act or series of acts upon the land of Mr. Titman, or at the outlet of the lake or elsewhere, which would give Mr. Titman a right of action against them, or the continuance of which could be the ground of a pre-

sumption of a grant from Mr. Titman to them or either of them of any right. The case is bare of any proof of a grant or any element of adverse user from which a grant may be presumed. If any easement has been acquired, it has been one by Mr. Titman, as owner of the dominant tenement, against the complainants, owners of the servient tenement, of a right to interfere with the natural flow of the stream by holding back the waters in a flood time and letting them down at his free will and pleasure in a dry time. Such interference with the natural flow of the water was probably an actionable injury to the complainants. *East Jersey Water Co.* v. *Bigelow, 31 Vr. 201.* But granting that such right was acquired by Mr. Titman against the complainants, it does not follow that because they, as owners of the servient tenement, enjoyed an incidental benefit from its exercise they are entitled to have it continued. They cannot compel Mr. Titman to keep up his dam across the stream below the lake, or to exercise his right, whether natural or contractual, to draw water therefrom for the benefit of any person whatever.

This has been settled for many years by the courts of England and of this country. *Gale Easem.* (*ed. of 1868*) *182 et seq.,* citing *Arkwright* v. *Gell, 5 Mees. & W. 203;* *Magor* v. *Chadwick, 11 Ad. & E. 571;* *Wood* v. *Waud, 3 Welsb., H. & G. Exch. 748;* *Ivimey* v. *Stocker, L. R. 1 Ch. App. 396;* *Mason* v. *Shrewsbury, &c., Railway Co., L. R. 6 Q. B. 578.*

And the true rule is stated by Chief-Justice Cockburn in the last-cited case (which was one of diversion) (at *p. 587*): "The right of diverting water which, in its natural course, would flow over or along the land of a riparian owner and of conveying it to the land of the party diverting it, the *servitus aquæ ducendæ* of the civilians is an easement well known to the law of this as of every other country. Ordinarily, such an easement can be created, according to the law of England, only by grant or by long-continued enjoyment, from which the existence of a former grant may be reasonably presumed. * * * But, however it may be called into existence, the right is essentially the same. The legal incidents connected with it are the same, whether the easement is created by grant or by statutory enactment. Now,

it is of the essence of such an easement that it exists for the benefit of the dominant tenement alone. Being in its very nature a right created for the benefit of the dominant owner, its exercise by him cannot operate to create a new right for the benefit of the servient owner. Like any other right, its exercise may be discontinued if it becomes onerous or ceases to be beneficial to the party entitled. An easement like the present, while it subjects the owner of the servient tenement to disadvantage by taking from him the use of the water for the watering of his cattle, the irrigation of his land, the turning of his mill or other beneficial use to which water may be applied, *may, on the other hand, no doubt, be attended incidentally with equal or greater advantage to him, as, for instance, by rendering him safe from the danger of inundation. But this will give him no right to insist on the exercise of the easement on the part of the dominant owner if the latter finds it expedient to abandon his right. In like manner, where the easement consists in the right to discharge water over the land of another, though the water may be advantageous to the servient tenement, the owner of the latter cannot acquire a right to have it discharge on to his land if the dominant owner chooses to send the water elsewhere or to apply it to another purpose."* And see *Godd. Easem. (Bennett's ed.) 61, 161, 250; Jones Easem.* § *807; Curtiss* v. *Ayrault, 47 N. Y. 73* (at *p. 82*).

It follows that Mr. Titman was at liberty, before he entered into the contract with the defendant, and is still at liberty, to allow his dam and works near Morris lake to fall into complete disuse and decay; and the fact that he has made a contract with the town of Newton, by which he has the right to have the same quantity of water in dry times that he was in the habit of having for years previously, does not alter the situation or give the complainants any greater rights than they had before.

Moreover, it is to be observed in this connection that there is no standard by which Mr. Titman can measure his contract right as against the defendant. There is no mode of ascertaining the quantity of water which he is entitled to have delivered to him in any one day, and the attempt to enforce it by legal pro-

ceedings will be attended with insuperable difficulty. No right is given him to help himself by personal action at the gates. He must depend entirely upon the action of the agents of the defendant, who act under its superior authority. A somewhat similar contract between the Society of U. M., at Paterson, and the Morris Canal Company produced nothing but fruitless litigation. *Society* v. *Canal Co.,* 1 *Halst. Ch. 203.*

Again, as I read the contract between Titman and the town, while it provides for the deflection of the waters of Pine Swamp brook into the upper or lake proper, instead of into the lower or artificial pond where Titman's raceway delivered it, it does not provide for any greater flow from the upper to the lower lake than Titman was in the habit of getting from the upper lake before the waters of Pine Swamp brook were so deflected. So that, by a strict reading of the contract, it would seem that Mr. Titman had, so far as he could, granted away the right to the flow of the Pine Swamp brook. This, however, may be altogether too sharp a view of the contract, which may be, and I hope is, capable of the other construction.

It is said, and was proven, that the agent of the defendant, who resides at the lake, eight miles from Newton, and controls the gates which let the water out of the upper lake, has standing directions to let out water for Mr. Titman's use whenever he asks it, and as much as he shall desire, and it is argued that there is no probability, according to the ordinary course of events, that this practice will ever be discontinued, or that the complainants will not in the future continue to derive the same benefits from the waters of the lake that they have in the past.

I have no doubt that the reservoir and gates may be so used as to work a decided benefit to the complainants. And if the legislature of this state were unrestrained by express limitation, and, like the parliament of Great Britain, had imperial power and could deal with the question at its discretion, and had done what that parliament has frequently done in similar cases, provided by statute for compensation by storage, the result might be different. (Parliament in such cases ascertains the natural flow of the stream, and fixes in the act authorizing the diversion

a minimum quantity which the water company shall at all times permit to flow to the down-stream riparian owner.   See *Waller* v. *Mayor of Manchester, 6 Hurlst. & N. 667,* in notes to *pp. 673, 674.*)   If it were practicable for this court, by an agent, to ascertain from time to time, in dry seasons, what quantity of water could safely be let out of the lake and allowed to run down the stream for the benefit of .the complainants without endangering the stated supply of the town of Newton, and it had the power to exercise that right in behalf of the complainants, it might protect them in their rights and allow them all the water that they are entitled by nature, and more, without injuring the defendant.   But this court has no such power.   And there are no data upon which it could fix the amount of water that should be let out in order to compensate the complainants for the draft taken by the town.   Hence, it is entirely clear that the court has no right, as against either the complainants or the defendant, to make any such decree.   None such was suggested by the defendant, and the contract between it and Mr. Titman prevents it from submitting itself to any such decree, if it were possible and practicable in other respects for the court to make it.

Confessedly, the flow of water from the lake will be, in dry seasons, entirely at the free will and pleasure of Mr. Titman and the defendant.

Then, again, it must be observed that Titman's mill is an ordinary country gristmill, doing, also, I believe, what is called merchant work, and that the use of a water power of that size for that purpose is, confessedly, becoming less and less valuable every year.   Mr. Titman is an old man.   His mill is some little distance from the railroad and has no switch leading to it.   So that the continuance of the use of the water power for present purposes, for any great length of time, is not very probable. The drainage area which furnishes the water of the stream at his mill is but eleven and sixty-six hundredths square miles, less than one-fourth that of complainants' mills, so that the natural flow of the stream is not sufficient to attract capitalists to apply it to other purposes.   It follows that the mill is certainly liable to fall into disuse, in which case there may be no

one to enforce the right of draft from the lake in the summer time, or Mr. Titman may at any time think proper to release it to the town.   In such case the temptation on the part of the town will be immediately to demand compensation from the owners of the water power at Hamburg, the complainants or their successors in title for letting down a supply of water in dry time.   Nothing that has been done by the town will estop it from so doing.   Besides, the practical difficulty, as suggested during the hearing, about letting down a flow of water in a dry time to lower millowners is that the disposition on the part of the town authorities will, in view of the well-known fact that the end of a drought cannot be predicted, be to save water against the exigency of an unknown continuation of the drought. Hence, the authorities of the town will always feel that they are running some risk in letting out water from the reservoir whenever the flow of its feeders is less than the amount diverted by the town.

It was urged by counsel for the defendant that the moral probability, under the circumstances, that water would be let out in dry times for the benefit of the millowners below is so great as to amount almost to a certainty.   But this proposition seems to me to be entirely inadmissible.   Courts may, and do, for certain purposes, take notice of the uniformity and persistence of the moral as well as the physical laws of nature, and it may be that a jury of casuists would hold that there will be a moral obligation resting on the defendant to let down a supply of water in a dry time to these millowners so long as the water shall be diverted for the use of the town.   But this court cannot count on that moral obligation being at all times felt and obeyed by the people of the town, for it is a part of the very system of morals governing mankind which is invoked by counsel that men and women do not at all times conform their conduct to accepted ethical rules, and this court cannot act upon the presumption that the intention of the defendant, however strongly expressed, will at all times in the future be fully executed.

These and many other objections which present themselves to

the mind preclude the possibility of entertaining the notion upon which the defendant has staked its principal defence in this case.    I feel constrained to consider the case upon the basis of the defendant's dam being a permanent structure, with no opening except that which lets the water out to Newton, so that no water can escape to the stream below except over its top.

Further, it is well settled that a party cannot make up for an injury done at one time by a benefit conferred at another time. This was distinctly held by the court of errors and appeals in the late case of *East Jersey Water Co.* v. *Bigelow, 31 Vr. 201.* There, as I understand it, the East Jersey Water Company, after building its retaining dam across the Pequannock river (for the use of the city of Newark), shut the gates to allow the reservoir to fill, and while it was so filling diverted the water from Mr. Bigelow's sawmill, situate on the river below the dam but above the intake where the company actually diverted the water, so that after the reservoir was full a greater quantity was let down to Mr. Bigelow in a dry time than he would otherwise have received, being the result of the storage which necessarily passed his mill before it reached the intake of the water works.    Such would necessarily and naturally be the effect of the dam, since all the water diverted for the use of the city passed his mill. And it was held that the benefit subsequently accruing from the flow of the water in a dry time could not make up for the injury sustained while the water was held back for the purpose of filling the large reservoir.

But the question here is by no means one of holding back water saved up in a rainy season to be let down in a dry season, and thereby equalizing the flow but not diminishing the aggregate flow.    We have to deal with an actual diversion of a considerable quantity of water.    The amount which will pass the complainants' mills in the course of a year will be diminished by a certain fixed amount, and there is no certainty that it will not be taken at a time when the power of complainants' mills will be sensibly affected.

In answer to this particular view the defendant advances the ground that the water which it will store is what its counsel

Sparks Manufacturing Co. *v.* Town of Newton.

called "flood or freshet water," which would naturally and necessarily pass by the complainants' dams without use, and in which they would have no property and the deprivation of which would be no injury to them.

There are several difficulties in the way of adopting this theory. In the first place, there will be here no catching and accumulation of what is classed as "surface" water. It will all be water which in the course of nature has reached the bed of a natural running stream and become commingled therewith. By such commingling it becomes a part of the stream itself, and the right of the lower riparian proprietors to have it pass by their lands becomes at once fixed. It is well settled that while the owner of land may catch and devote to his own uses, to the deprivation of all others, water which falls upon the surface of it, he must intercept and segregate it before it reaches a natural running stream. The doctrine on this subject was thus stated by Baron Alderson, in *Broadbent* v. *Ramsbotham, 11 Hurlst. & G. 602* (at *p. 614*): "No doubt all the water falling from heaven and shed upon the surface of a hill, at the foot of which a brook runs, must, by the natural force of gravity, find its way to the bottom and so into the brook; but this does not prevent the owner of the land on which the water falls from dealing with it as he may please and appropriating it. He cannot, it is true, do so if the water has arrived at and is flowing in some natural channel already formed. But he has a perfect right to appropriate it before it arrives at such a channel."

The American authorities are all in accord with this statement of the law, and, with other English cases, are collected in the late editions of *Ang. Waterc.* § *108, note, et seq.*, and in *Gould Wat. 263 et seq.* And see Chancellor Pennington's definition of a natural water-course, in *Shields* v. *Arndt, 3 Gr. Ch. 234* (at *pp. 246, 247*); *Earle* v. *De Hart, 1 Beas. 280*.

I find it quite impossible to distinguish, in the matter of exclusive title and riparian right of user, between what counsel for the defendant classes as "freshet or flood water" and other water. They are all parts of the running stream, and, as such, become subject to the right of user by the riparian owner.

And who shall establish the criterion and determine at what point or degree of expansion, by reason of rains and melting snow, a stream loses its character of natural flow and becomes " freshet or flood " water?

It is here to be observed that defendant's impounding appliances are not designed or intended to intercept " flood or freshet " water only and permit the natural flow at other times to take its natural course. On the contrary, the plan and practice is, and must be, to intercept and impound, and thus intermingle, all waters indiscriminately.

The question now under consideration is not the value to the riparian proprietor of the use of "flood or freshet" water, as compared with the ordinary flow of a stream, but the question is as to the right of the up-stream riparian owner to collect it and save it, and divert it entirely from the down-stream riparian owner. It is one of title and not of value. The fact that it may be of very little value to the down-stream riparian owner does not justify the up-stream riparian owner in diverting it. The remarks of Mr. Justice Depue, in charging the jury in *Hard Rubber Co.* v. *East Jersey Water Co.*, relate not to the right to divert, but solely to the value of the water diverted. The same remarks apply to the case of *In re Tracy, 16 N. Y. Supp. 606 (1891)*, cited by defendant's counsel.

And even in the matter of value, it by no means follows that in the present case what might be deemed a flood or freshet in the neighborhood of Morris lake would not be of considerable value in its flow at Hamburg. One of the advantages of a water power on a stream of considerable drainage area is not only that the average flow of water increases in proportion to the size of the drainage area, but that in summer time, in dry weather, showers often occur in portions of the area, upon a mere tributary, which add considerably to the main stream without overcharging it, and thus tend to make the flow more steady and permanent. A heavy summer shower on the mountain east of Morris lake, covering Pine swamp, might swell the stream flowing therefrom considerably, and make what would be properly termed a flood at that point, which, in the absence of any

catchment, would spread itself over the river and have a beneficial effect at Hamburg, but would be entirely caught up by the defendant's impounding apparatus, and used to raise the water in its lake at a time when there was really no necessity for further storage.

Counsel for defendant relies, in support of his view as to flood and freshet water, upon certain expressions found in the various opinions which have been published disposing of the several controversies which have arisen between the Society of U. M., at Paterson, as owners of the bed and banks of the Passaic river there, and the Morris Canal Company.

The first of these is the opinion of Chancellor I. H. Williamson, delivered in 1829, before the erection of the canal was completed, first reported in *3 Stew. Eq. 145.* A careful examination of that opinion shows that the question involved was not as to the right of the canal company to divert waters, either stored or natural flow, from the Passaic river without making compensation to the owners of water rights thereon, but as to its right to do so even upon making such compensation. In the opinion it is repeatedly stated that the canal company expects to be obliged to make compensation in accordance with the terms of its act, which compensation, under the then constitution of the state, it was not necessary to make before the diversion occurred. But the question raised and debated was whether or not the canal company had the right to divert the water of the Passaic or any of its tributaries from the society even upon the terms of making compensation. Chancellor Williamson, after asserting in the most positive manner the right of the society as riparian proprietor to the uninterrupted and undiminished flow of the river at Paterson, with all its tributaries, states the question before him to be, " whether the Morris Canal and Banking Company has a right, under or by virtue of its charter, to divert the waters of the Passaic river, *making just compensation to the society* for any actual injury which they shall sustain, and this is a question of the greatest moment to the society." The society based its claim to immunity from the exercise of the eminent domain of the state on the ground that the state had granted to

it by its charter a special right, in addition to its natural riparian right, to use the power of the waters of the Passaic for manufacturing purposes. And the conclusion of the learned chancellor was that the legislature had given a special right to the society, and did not intend to give a right to the canal company to divert any of the waters of the Passaic even upon making compensation. The injunction applied for by the society was refused on the ground that the canal company proposed to store waters in Lake Hopatcong, not by nature tributary to the Passaic, and to contribute to the Passaic at Dover as much water as it would take out above the falls at Paterson.

After the canal was finished and wholly or partially filled and about to be put in use the injunction was again applied for to Chancellor Vroom, who dealt with the question in his opinion, reported in *Sax. 157*, where the rights of the society were again declared by the chancellor in the strongest manner. He treats any diminution of the flow of the waters of the river at Paterson as an injury to the society, and what he says about the storing up by the canal company of extra water coming from Green pond, one of the tributaries of the Passaic, is a mere statement of the claim of the canal company, and is in nowise recognized by either of the chancellors as being valid. On the contrary, it is, in effect, declared invalid by their clear and express statements of the society's rights. The expressions relied upon by the counsel of defendant herein, found in the briefs of counsel as reported in Saxton, as to the scarcity of water in the months of July, August and September, were used in connection with the discussion of the question whether or not, by the use which had been made of the canal up to that time there had been any actual diversion. That was a disputed question of fact. The injunction was again denied by Chancellor Vroom upon the express ground that the canal company proposed and promised to contribute to the flow of the Passaic, waters taken from the Musconetcong and from the Raritan, neither of them tributaries of the Passaic, equal in quantity and quality to that taken out of the Passaic at Paterson. He held that such contribution did not lose its value by being commingled with the waters of the Passaic, although he

anticipated that a difficulty might and probably would arise between the parties as to whether or not the contribution was equal to the abstraction.

And the supposed admission of Mr Southard, counsel for the society, in his argument (cited by defendant's counsel), as reported in *Sax. 182* (at top of *p. 183*), was only an admission as to the intention of the legislature, as expressed in the charter of the canal company, to give it a right to divert any of the waters of the Passaic *upon terms of making compensation to the riparian owners.* I have just shown that that was the real question argued before Chancellor Williamson, and his decision in that respect was assumed to be the law in the subsequent argument before Chancellor Vroom. And the expression found in *Sax.* (at top of *p. 183*), in Mr. Southard's argument, quoted in his brief by counsel for the defendant herein, is followed by this: "And all they [that is, the canal company] are entitled to of this pond is, only the advantage of it as a reservoir, or the use of the additional water that may be accumulated there in the wet season; its ordinary flow is not to be interrupted." Mr. Southard then proceeds to say that granting their right to take the surplus waters of Green pond *by condemnation,* they have not yet acquired that right by the proceedings prescribed by their charter. And later on in his brief (*Sax. 185*), he reiterates the claim of the society to the full flow of all the waters of the Passaic.

It is hardly necessary to say that there was no question in either of those suits between the canal company and the owners of land on the Musconetcong, from which they diverted part of the waters of Lake Hopatcong. It was necessarily assumed, as between the society and the canal company, that the water that they contributed to the Passaic was, so to speak, their own water. It did not lie in the mouth of the society to say that the canal company had no title to it as against the riparian owners of the Musconetcong and Raritan.

Then counsel for defendant further relies upon what was said in the litigation which arose after a written agreement had been entered into between the canal company and the society, which

was brought on before Chancellor Halsted, as reported in *1 Halst. Ch. 203*. I am unable to see anything in that agreement which, at the time it was entered into, was supposed to be mutually beneficial, can affect the present question.

Of the later litigation, as reported in *3 Stew. Eq. 145*, before Chancellor Runyon, and again on appeal in *Society* v. *Lehigh Valley Railroad Co.*, *5 Stew. Eq. 329*, it is enough to say that the ground upon which the late chancellor granted relief in that case was distinctly repudiated and disallowed by the court of errors and appeals, and the court retained the preliminary injunction upon the ground of acquiescence or estoppel as against the society.

But the counsel for defendant further relies upon the action of the court of appeals in the case of *Higgins* v. *Water Co.*, already referred to, and to the language of the last clause of the opinion which, while it reversed the decree below, declared there should be an injunction " from abstracting such quantities of water from this stream and at such times as will be detrimental to the full enjoyment of the stream by the complainants. The terms and extent of the injunction being left to the judgment of the chancellor upon the case as it stands or upon further inquiry to be made by him."

I have already remarked upon the extremely small quantity of water diverted in that case, and upon the fact that the natural drainage of the town of Flemington went into a brook which emptied into the Raritan, above the mills of the complainants, so that they got the benefit of the drainage of the town. There is further to be noted in that connection the fact that complainants' wheels could not use all the water of the river in a full flow. There was still another element in that case relied upon by the water company, namely, that their principal and at one time their whole supply came from the headwaters of the Neshanic river, which emptied into the Raritan below the mills of the complainants, and to the flow of the waters of which they were therefore not entitled, and that the house and stable drainage of the town which reached the Raritan above the complainants' mills was due not only to the waters which would

be pumped out of the Raritan, but also to the waters which would be brought into the water-shed from the Neshanic, and the benefit of which drainage was felt at the complainants' mills; and it was strongly urged in behalf of the water company that the drainage from the two sources would be quite equal to all that would be abstracted by pumping from complainants' mills, so that there was in point of fact no actual diversion. But, as before remarked, there were no reliable proofs offered as to the amount of this contribution and nothing upon which the court could found a decree, and the expressions just quoted from the opinion of the chief-justice and the leave granted to the chancellor to inquire as to actual injury were construed by all parties as giving leave to the chancellor to open the decree in that respect and permit proof to be offered as to whether there was any actual, and if so, how great, a diversion.

But further with regard to that and similar cases of pure injunction bills. The notion prevailed for a long time, and perhaps still prevails, that if no actual present pecuniary injury be involved, no injunction should be granted; and hence counsel preparing bills always attempt to show an actual present pecuniary injury, in order to catch the ear of the court, and to that end state at great length the present use which is being made of the water and the injury which its deprivation is working. Now, without determining whether or not, in order to justify an injunction, there must be a present injury in money, or whether, on the other hand, an injunction should go where there is an interference with a bare right, as in the case of an actual deprivation of a fixed quantity of water from a riparian owner where he had not as yet at all improved and was not using his water power, it is enough for present purposes to say that the principle laid down in *Higgins* v. *Water Co., supra,* as applied to the present case, compels me to grant an injunction, because I cannot find that, in point of fact, there will be no present injury to the complainants by the diversion of the quantity here proposed to be taken; but, on the contrary, I am satisfied that the amount proposed to be diverted will be felt at their works. The amount—eight hundred thousand gallons a day—

will produce, roughly speaking, about two and a half continuous horse power for twenty-four hours at each of the mills, and that, in comparison with the amount diverted in the case of *Higgins* v. *Water Co.*, is so great that the special direction of the court relied upon can have no weight here.

I conclude my observations on this point by saying that I can find no foundation in reason, nor authority in judicial decision, for the position that a superior riparian proprietor may, in times of what he calls flood or freshet water, abstract such water from a stream and permanently divert it therefrom.

Another ground taken by counsel of defendant in his brief is that the defendant is a riparian proprietor, and, as such, is entitled to abstract water for domestic purposes. That state of things also existed in the case of *Higgins* v. *Water Co.* The town of Flemington, as I have already stated, was situate at the head and on each side of the Bushkill brook, and the inhabitants of it had a clear right to abstract water from that brook for domestic purposes, and it was shown by actual measurements that the natural flow thereof was much more than sufficient to compensate the complainants for all the water that was abstracted; and it was contended that in addition to the amount of water contributed to the stream by the sewage of the town, the inhabitants had allowed the waters to run naturally into the river instead of appropriating them, as they had a right to do, for domestic purposes, and instead thereof took a less amount out of the Raritan river, and the principle of substitution of water, as held by both Chancellor I. H. Williamson and Chancellor Vroom in the cases just cited, was appealed to, but all in vain. The chief-justice, in speaking for the court of appeals, did not think it worth while to notice that position urged by the counsel for the water company.

But the defendant here does not occupy so favorable a position as did the inhabitants of Flemington in that case. Newton is situate eight miles from the river at Sparta, and, as before remarked, its drainage runs into another valley, and the inhabitants which it intends to supply are in no sense riparian proprietors; and it would be absurd to say that the town can go

over to the Wallkill river and buy a few acres of land upon its banks, and on the basis of that ownership claim that the inhabitants of Newton, eight miles away, have become riparian proprietors and are entitled to help themselves from the waters of the river for domestic purposes. As well might the city of Jersey City buy a piece of land along the Wallkill, and on the strength of that divert the water to supply its purposes. The only authority for this position is found in a head-note taken from Fisher's Digest to the case of *Norbury* v. *Kitchin*, reported at *nisi prius* in *3 Fost. & F. 292*, and, on review of the verdict and direction of the judge *in banc*, in *7 L. T. (N. S.) 685* (where the head-note is found), and *9 Jur. (N. S.) 132*, the latter being the better report. I have examined all of those reports with care, and none of them bear out the head-note in question. The facts were that Kitchin, the defendant, owned land on a small stream of water, just above the estate of Lord Norbury, the plaintiff. Kitchin's tract was not, however, wide enough and large enough to build upon, and he bought a piece off Lord Norbury's estate adjoining his own for that purpose, which piece did not itself, after being detached from Lord Norbury's land, touch the stream. Upon that he built his house, and by the power of the fall of the stream pumped the water into a reservoir on a hill back of the house, and used it, not only for domestic purposes at his house, but also for supplying an ornamental pond, the amount abstracted being one-fortieth of the stream, which abstraction did not materially injure it for the use of Lord Norbury or his property. The learned baron (Martin) charged the jury that the defendant, Kitchin, had no right to take any of the water except for strictly domestic purposes; had no right to supply the ornamental pond, or dam it back unreasonably, and had no right as riparian proprietor to take any more out for use than he could dip out with buckets. That, subject to that limitation as to quantity, the mode of taking it was immaterial. He left it, in effect, to the jury to say whether the land where it was applied to domestic purposes was within a reasonable distance of the stream or not, and whether the use, with the exception of the artificial pond, was a

reasonable one.  The jury found that it was, and Lord Norbury obtained a rule to show cause why the verdict should not be set aside.  The fact that the ownership of the actual bank of the stream, in connection with the piece of land bought off Lord Norbury's estate, did not constitute the defendant a riparian proprietor in the strict sense of the term was debated, but finally abandoned by the counsel of Lord Norbury.  This was plainly on the ground that the location of the house was within a reasonable distance from the stream.

The courts have been unable to define the distance to which a riparian proprietor's right of user for domestic and such purposes extends; nor have they been able to say what proportion of the stream might be used for such purposes.  These questions depend upon the circumstances of each case as they present themselves, and. the only rule which has or can be laid down is that both the distance and the use must be reasonable.  Applying that rule here, I find, as a matter of fact, that the ownership of a portion of the banks of the stream by the town of Newton gives it no right to divert the water.  Moreover, I find the tendency at least of the modern cases to be against allowing a town to supply itself with water from a river simply because a portion of its inhabitants are riparian proprietors.  *Ætna Mills* v. *Waltham, 126 Mass. 422.*

Finally, on this part of the case.  Defendant's counsel claimed that the strict rights of the riparian proprietor at the common law of England had been ameliorated with the advance of civilization, and is not held so severely here as in other countries, and says that this is particularly true in New Jersey.  I confess that prior to the decision of *Higgins* v. *Water Co., supra,* I entertained to some degree that opinion, but the *Higgins Case,* and others since decided, constrain me to say that I am unable to assent to the counsel's proposition.  On the contrary, I think the common-law rights of riparian owners are still held in New Jersey with great strictness.

The result is that I hold the defendant's defence not made out, and come, with regret, to the question of compensation.

Both parties submitted themselves to the jurisdiction of the

court in this respect, and requested that it should determine the amount of compensation, and I feel constrained by the state of the authorities to assume that jurisdiction. The cases are the following: *Trenton Water Power Co.* v. *Chambers, 1 Stock. 471* (at *pp. 475, 476*); *S. C., 2 Beas. 199 ; Carson* v. *Coleman, 3 Stock. 106* (at *p. 108*); *Carpenter* v. *Easton and Amboy Railroad Co., 9 C. E. Gr. 249* (at *pp. 258, 260*); *S. C., 9 C. E. Gr.* (at *p. 408*); *S. C., 11 C. E. Gr. 168 ; S. C., 1 Stew. Eq. 390; North Hudson County Railway Co.* v. *Booraem, 1 Stew. Eq. 450* (at *p. 456*); *New York and Greenwood Lake Railroad Co.* v. *Stanley, 7 Stew. Eq. 55* (at *p. 58*); *S. C., 8 Stew. Eq. 283 ; Kamlah* v. *Paterson, &c., Railroad Co., 15 Stew. Eq. 93 ; S. C., 2 Dick. Ch. Rep. 331.*

And first, as to the quantity of water. I have already stated that the amount of eight hundred thousand gallons a day was fixed at the trial as the amount to be diverted. I permitted the defendant to adopt that limit, notwithstanding some expressions in its answers, on the ground that under the circumstances I did not think it should be held strictly to those expressions.

Counsel for the complainants, notwithstanding, contends that, by force of an expression in the printed argument of the defendant, it has abandoned the eight-hundred-thousand gallon limit and advanced its claim of condemnation to the amount originally fixed of one million two hundred and fifty thousand. I do not so construe the language of the argument. It is used in connection with defendant's claim of an absolute right to divert and with its defence on the merits, and not in connection with the question of the amount of water for which it should pay.

It was asserted by the counsel of the complainants, and it is undoubtedly true, that the defendant will be able to divert more than eight hundred thousand gallons a day and still keep up the proper head of water through the town. This can be accomplished by building a reservoir—which is a part of the original plan—upon high ground above the town and filling that in the night time and using the water so stored for use by the higher portions of the town in the daytime, and then cutting off, by proper stop-gates, the lower portion of the town from the upper

and letting out water for mechanical purposes in the lower part of the town under a greater head. But I am entirely satisfied that such diversion can never amount to one million two hundred and fifty thousand gallons in twenty-four hours, for the reason that it cannot exceed the rate of eight hundred thousand gallons while the reservoir is in process of filling, and cannot exceed the rate of one million two hundred and fifty thousand gallons at other times, because of the elevated point in the main between the lake and the town. To prevent the possibility of abstracting more than eight hundred thousand gallons per day, I imposed terms upon the defendant of fixing upon its main, at a convenient point, a registering meter which should be open to the inspection of the complainants, and thus enable them to detect any abstraction beyond the limit. To this it was objected by the complainants that its use would subject them to additional trouble and expense in watching and defending their rights. I think this objection has some merit, and it will be taken into consideration hereafter.

In dealing with the case, even upon this smaller measure of diversion, it is impossible not to feel that there is no probability that anything more than a fraction of it will be used for many years to come, if ever. The needs for domestic use of the present population will not require more than one-quarter of it, and if an additional amount be let out for mechanical purposes, it can never reach eight hundred thousand gallons a day without the aid of a distributing reservoir, for the reason that the use will be mainly, if not entirely, during business hours, and eight hundred thousand gallons was fixed as the limit of a continuous flow for twenty-four hours, at a head sufficient for supplying the higher portions of the town. Notwithstanding this element, it is my duty to assess the compensation upon the basis of an actual diversion and according to the rules which govern a jury upon regular condemnation proceedings. Neither party should derive any benefit from the fact that the assessment is made by a court of equity, unless there be, in fact, present some equitable element which a common-law court cannot, by reason of its

restricted jurisdiction, take into account.   I know of none such here.

It was contended by the defendant that an allowance should be made from the amount of water diverted for the evaporation which would naturally take place in its passage from Morris lake to the complainants' mills.   It is undoubtedly true that water flowing in a stream in dry, hot weather is subject to considerable evaporation.   But that fact does not help the defendant, for the simple reason that it abundantly appears from the nature and character of the Wallkill that the evaporation is a constant quantity—that is, it will be as great with the abstraction as it will be without.   The surface of water presented to the sun and wind will be the same, and the tendency, as shown by Mr. Vermeule, will be to increase, rather than diminish, the total evaporation as the stream becomes shallower and more objects, such as stones, &c., are exposed to the action of the sun.

I shall therefore proceed to inquire what injury eight hundred thousand gallons abstracted every day will be to the complainants' mills, or, more strictly speaking, how much their market value will be reduced by such diversion.

In fixing the amount of the depreciation in market value of the whole premises of the complainants, the amount of power to be produced at their mills by the quantity of water diverted, and its value to them for actual use, and the cost of reproducing it, are proper elements to be considered.   This was substantially held by the supreme court in the recent case of *Butler Hard Rubber Co.* v. *City of Newark, 32 Vr. 32.*   That case was somewhat similar in its circumstances to this.   I have had the benefit of reading the whole of Mr. Justice Depue's charge to the jury in connection with the part contained in the report just referred to.   But, in my judgment, the propriety of considering the actual moneyed value to the complainants of the water diverted may be put upon higher ground than that of merely injuriously affecting land to the depreciation of its market value. The right of the riparian owner to use the power of the waters of the stream is property in its strictest sense, and the diversion of a certain quantity of water from the riparian proprietor is, in

my judgment, the taking of just so much of his property and may be safely treated as such.

Now, it is to be observed at the start that the value of water power depends upon a variety of circumstances, the most important of which are these:

*First, the quantity of power.* Years ago a great many small water powers were put to beneficial use in various parts of the country that have now fallen into disuse, mainly, in connection with other circumstances, on account of being so small as not to be worth using. The tendency of modern times is to cheapness of production by the use of large establishments and plants. Other things being equal, the larger the plant the cheaper the production from it. Hence, small water powers are of little value.

*Second, vicinity of market by railroad or water communication.* An immense amount of unused water power is at present running to waste because of its inaccessibility. All great establishments nowadays need to have ready and cheap communication with business centers.

*Third, the character of the surroundings.* All manufacturing enterprises require more or less human labor. In order to make them a success there must be a labor market in the neighborhood, either at present or in prospect. The cost of land for residence and the cost of living are also important elements.

*Fourth.* Has the water power already been developed by the erection of substantial and permanent dams, and has it been applied to a useful and profitable purpose, so that there is a prospect of its having an opportunity to earn money for its owners for years to come?

*Fifth, distance from the coal-producing regions.* Few water powers are large enough to be operated advantageously without being supplemented by steam power in dry seasons when the flow shrinks.

If all these favorable elements are combined in one plant—if the power is considerable and worth dealing with, near a railroad, so as to have switching facilities; if coal is cheap at that point; if there is a population in the neighborhood from which

cheap labor can be drawn, and it is already developed and at work at a profit, near a good market—you have combined elements which will give it the highest value.

### SPARKS COMPANY CASE.

And first, the water power of the Sparks Manufacturing Company. Its mill is just above Ingersoll's, so that its entire head and fall is measured by the difference in the height of its dam and that of Ingersoll's, and that difference is substantially twenty-four feet. The Sparks company's dam is not quite uniform in height. There are a few depressions, and some parts are less than twenty-four feet and others more than twenty-four feet higher than Ingersoll's dam. Those depressions can be easily and cheaply filled, and I find the practical difference to be twenty-four feet. That amount is not actually used by the Sparks company. There is a loss of head in getting the water on to the wheels, and also obstructions in the tailrace, which I will deal with directly, and at present treat the power as having an available head and fall of twenty-one and one-half feet, but capable of being cheaply increased, as we shall see directly, to twenty-two and one-half feet.

I make the power of the stream, at eighty per cent. of its theoretical value, at twenty-two and one-half feet head and fall, to be as follows, adopting the flow of the river as shown by Mr. C. C. Vermeule's tables, made up by him for use in these causes: Seventeen and three-tenths horse power, for the average flow of the five driest months of Mr. Vermeule's driest year, occurring once in fifty years; forty-four horse power, for the average of three driest months in his dry year, occurring once in seven years; and seventy-eight horse power, for the average of the three driest months in his average dry year, which included, as I understand it, the dry year occurring once in seven years. Allowing for leakage in the dam and gates and necessary waste in use, I think that the minimum power may be safely put somewhere between seventy and seventy-five horse power in the average dry year. This seems to me to be of sufficient size to

attract capital, without taking into account the great increase that results for nine months of the year from the increased flow of the stream.

The experts of the parties differed as to the proportion of theoretical power practically available from a given flow and head and fall. Those of the defendant claimed that there is thirty per cent. loss, and only seventy per cent. available, while those of the complainants, admitting that amount of loss on an ordinary bucket vertical wheel, claimed eighty per cent. or more available, upon turbine wheels such as are in use by the Sparks company. This eighty per cent. and upwards is only obtained when the turbine wheel is running at full gates, and is in good order and repair and unobstructed by small objects carried by the water. In practical use it often happens that it becomes desirable, on account of short water, to operate the wheels at partial gates, the result of which is that the percentage of power is considerably reduced. Further, a slight difference may arise from the mode of measuring the power. The water power in this case was subjected to a comparison with steam power, and there is a certain loss in indicated steam power, amounting to from five to ten per cent., as shown by the evidence of the defendant's experts. I think that twenty per cent. off the theoretical horse power, due to falling water, is ample for so much of the power as is produced by turbine wheels on full gates.

Eight hundred thousand gallons in twenty-four hours is equal to one hundred and six thousand nine hundred cubic feet, and makes seventy-four and three-tenths cubic feet per minute, and one and twenty-four hundredths cubic feet per second. This gives three and seventeen-hundredths theoretical and two and fifty-four hundredths net continuous horse power per day of twenty-four hours, or five and eight-hundredths horse power for twelve hours.

The question is, how much is that worth to the Sparks company?

Hamburg is a small village, situate in a populous, fertile and healthy valley, with other villages near it, and with a population amply sufficient to furnish all the laborers that are needed

for the Sparks company's mill; and land, rent, and ordinary living expenses are cheap in the neighborhood. So that it is a desirable location for a mill employing a moderate number of ordinary laborers.

In the next place, it has two rival railroads leading from it to the coal regions, and delivering coal very cheaply, namely, pea coal fit for use in steam-making, at $2.15 a net ton. It has one railway that connects it with New York and makes cheap freights.

The Sparks company owns sufficient land at the point in question for factory uses, and a switch from the railroad to its mill. The water-shed is forty-eight and fifty-hundredths square miles, and there are, on the sources of the river, several small natural lakes besides Morris lake, and two or three artificial ponds which tend to hold back flood water and equalize the flow of the stream. Some of those natural lakes have artificial arrangements like those that were in use in Morris lake, to hold back the water in flood and let it down in drought. So that the stream is a steady one, and by no means torrential in its character.

In February, 1897, by a pretty accurate measurement of the flow of water over Ingersoll's dam, over six thousand cubic feet a minute were found running, and that amount would produce over two hundred continuous horse power. The Sparks company use a considerable quantity of water for paper-making other than power, and also for condensing steam on their steam engines. On the occasion just mentioned the whole flow was being used, and was producing from one hundred and twenty to one hundred and forty continuous horse power, the difference being due partly to the fact that the machinery of the Sparks company, as before remarked, is not arranged to use the whole of its head and fall, and partly to the use of a part of the flow for paper-making and condensing, and to propel a small turbine used to drive a printing press.

The Sparks company's dam is composed of crib-work, that is, wooden cribs laid up and heavy stones laid between them. It was partly washed away in 1869, and rebuilt in the same manner,

and an addition of several feet made a few years later. It is eighteen feet in width, measuring up and down stream, of solid stone and wood, besides twenty-two feet and more of earth and gravel on the upstream side, rendering it substantially water-tight. It is strengthened and supported by buttresses at each end, placed down stream from the dam itself, anchored in solid bed-rock, and built up of solid stone and cement masonry. These are built as well as the work can be done; and it seems to me that the dam must be treated as a solid, substantial and permanent dam, which will probably not need to be renewed in a great many years.

The water power is developed mainly by twin turbine wheels, which will produce one hundred and twenty or one hundred and thirty horse power operating under a head and fall of a little over nineteen feet. Either alone is about fitted to the ordinary minimum flow. Besides, there is a small turbine under a less head, used to drive a printing press.

Of the twenty-four feet net head and fall, about a foot and one-half is lost when both wheels are running, by friction in the headrace and screen or rack used to exclude floating objects; and about three feet in the tailrace. The expert of the defendant made an estimate that it would cost some two or three thousand dollars to so change the appliances by increasing the size of the headrace and cleaning out the tailrace as to get the whole head and fall. But the expert of the complainants thought it was not worth while to incur so much expense, or to make any increase in the size of the headrace, and estimated that by spending less than $500 the tailrace could be enlarged in size, and suction tubes put on the wheels, so that at all times there could be at least twenty-two and one-half feet net head and fall produced. This twenty-two and one-half feet net would provide for a loss due to the depth of water running over Ingersoll's dam.

I think the estimate of the complainants' engineer is reliable in this respect. And it is here to be remarked that as the head-race is, as we have seen, sufficient in size to carry six thousand cubic feet a minute (less the amount used for washing, &c., and

Sparks Manufacturing Co. v. Town of Newton.

on a small turbine) to the wheels with a loss of less than a foot and one-half head, it will probably carry the whole stream in an ordinary run to the wheels when only one will be running, at a much less loss of head. So that the result will be that the same quantity of water will produce more power in a thin stream than in a full stream.

The cost of increasing the head and fall to twenty-two and one-half feet is so slight that I have taken that as the proper head and fall upon which to make the calculation of power.

The Sparks company supplements its water power by a large steam plant, producing over one hundred horse power, with two or more boilers and one large engine and five or six smaller engines. It manufactures fine white tissue paper, and finds the water of the river nearly all the time in such a state as to be fit to be used without filtering, for making the whitest tissue paper. In fact, it uses no filter. It does a large and apparently successful business and employs about seventy men in its works. The mill is run night and day, stopping only for the Sabbath hours. It has about nine acres of pondage, and stops the steam power on Saturday night some hours before the water power, and runs altogether by the latter in the late hours of Saturday, and by drawing down its reservoir can ordinarily save the Sabbath flow and lose no water.

The evidence is undisputed that, including a large amount of water which is used for washing rags and in the beaters and on the paper machines, and for condensing steam, it uses all the water every day excepting on a few occasions of flood water when some runs away for a few days at a time, but which, all added together, does not exceed four or five weeks in the whole year. Taking it at five weeks would give a surplus for just one-tenth of the year, and the net result is that all the water is available for use in the mill for power for nine-tenths of the year, and that during the other one-tenth any abstraction of the water does not materially injure the power, and, as charged by Mr. Justice Depue in the *Hard Rubber Case*, this circumstance must be taken into account in fixing the compensation.

Eight hundred thousand gallons of water a day is equal to

26

one hundred and six thousand nine hundred cubic feet, and that, as before remarked, is equal to seventy-four and three-tenths cubic feet a minute, or one and twenty-four hundredths cubic feet a second. That flow, on twenty-two and one-half feet head and fall, will, as we have seen, produce three and seventeen-hundredths theoretical and two and fifty-four hundredths net continuous horse power, which the millowner will lose for nine-tenths of the year, a little less than eleven months.

Now one element in ascertaining the injury which that diversion will be to the value of the property is to ascertain how much present injury it will be to the complainants in the daily working of the mill.

The Sparks company's large engine is an old-fashioned simple slide-valve engine, which is wasteful in the use of fuel, so that the experts on each side are substantially agreed as to the cost of producing on it a continuous horse power at the price paid for coal at Hamburg. Mr. Phillips, for the defendant, estimated it, as I understand his evidence, at nearly $100 a year, and Mr. Van Winkle, the expert of the complainants, estimated it at $110, upon an engine using less fuel. That would make the loss to the Sparks company by the proposed abstraction well nigh $250 a year, which, if capitalized, would amount to a considerable sum.

Defendant's counsel contends that complainants' loss should be estimated at the additional cost of coal to drive its steam engine. They argue that two or three additional horse power can be obtained from any ordinary large engine by the same attendance, wear and tear, &c. The complete answer to such contention is that it is not true as to the wear and tear. The more work that is put upon an engine the greater the wear and tear. In the second place, the cost of attendance and maintenance is a part of the cost of the whole power, and the complainants are entitled to use all the power to be made out of any engine they may install for the purpose of their business, and are not obliged to devote any part of it to making up the loss due to the diversion of water. The defendant cannot be credited with the benefit of the use of the engine without being subjected

to the burden of a share of the whole cost, including wear and tear, attendance and maintenance.

But the capitalized result is subject to deduction by reason of the introduction of other elements.

In the *first* place, for how long a time, and how steadily, is it probable that the Sparks company will, in the ordinary course of business, find it profitable to use its power and be obliged to incur the expense of an increase in its steam power ?

*Second.* How soon will its managers, as prudent men, in the regular course of business, throw out the wasteful engine now in use and put in one of a modern, improved pattern, which seems to be admitted to be a compound Corliss engine, which can produce steam for about one-half the cost in fuel of their present engine ?

*Third.* How long will it be profitable to carry on works at that place ? How soon will the present plant be entirely abandoned and become comparatively of no value ?

These are some of the elements in the case which give trouble.

The proofs show that the mill has work to do steadily and without intermission. The business seems to be thoroughly established and to be carried on at a profit. The use by mankind of paper in some form seems to be established permanently, and the market for it is unlimited. It has become a staple production. I see no reason to infer that the business is not, so to speak, a permanent one in the respect that it does not depend upon a mere changeable fashion of the day. If the managers have the judgment, acuteness and energy to keep up with the improved methods of the day, there is no reason why it should become unprofitable.

The tendency of business progress is not to abandon water power where it is found in sufficient quantities and in proper locations ; but, on the contrary, it is rather to develop and use water powers not heretofore used. A striking illustration of this tendency is found in the development of the power of the Niagara river. And, as we have already seen, the water powers which have been abandoned are the small and inaccessible ones.

Of course most water powers are liable to shrinkage in dry

seasons, and this is a serious objection, and materially diminishes their value. . In fact, the value of a water power of this kind is determined mainly—other things being equal—by its dry-weather flow. But this defect in fluctuation is, in part, overcome where they are so located that the periodical shrinkage can be met and supplemented cheaply by coal.

If the location and other circumstances be such as to make the use of steam profitable and desirable, then the water power should be rated in value at the cost of producing steam, up to the amount produced by the ordinary dry-weather water flow. All produced beyond that amount is of much less value by reason of its variableness and of the fact that, in order to use it for work requiring power through all seasons, it is necessary to install and maintain a supplemental steam plant which must stand, wholly or in part, idle while the water power is being used, and during such idleness only the coal is being saved; the interest on the first cost of the plant, and the cost of skilled labor and general maintenance being substantially the same whether the steam plant is used to its full power or only partially.

I have said that up to the amount of the water power due to dry-weather flow it should, under favorable circumstances, be rated as valuable as the cost of steam power; but of course it cannot be worth more than the cost of producing steam power at that point, and that cost must not be fixed by the cost of making steam in a mere supplemental steam-power plant, but in one large enough to do the work of the whole plant. In such case the cost will be something less, for the reason that steam power can always be produced more cheaply when made on a large scale than on a small one; that is to say, in the present instance a steam plant large enough to do all the work of the Sparks company will produce steam at a trifle less cost per horse power than one gauged at a size sufficient merely to supplement the water power.

In this case the ordinary dry-weather flow will produce, as we have seen, about seventy horse power at Sparks' mill with a head and fall of twenty-two and one-half feet; and I think the

circumstances are such as to warrant placing its value at the cost of producing steam power. Its favorable location has already been mentioned. The water of the river is fit to make white tissue paper, and in fact all white papers, without being filtered, which is a material circumstance and increases the value of the location for paper-making.

But before applying the test of the cost of producing steam power at that point, we must inquire as to the amount which will be abstracted in a dry time, or, in other words, whether or not the amount abstracted—eight hundred thousand gallons a day, or seventy-four and three-tenths cubic feet a minute—is more than the natural flow of Morris lake and Pine Swamp brook in a dry time, for it must be observed that we are considering the case as if there were no impounding reservoir at Morris lake, or as if the gates of the present reservoir were never opened to let any water down the stream, but that it is allowed to run its natural course, except so far as it is diverted by the town of Newton. If, then, the amount naturally running from Morris lake and Pine Swamp brook combined does not, in a dry time, amount to the whole eight hundred thousand gallons a day, then the difference between the natural flow and the amount diverted will be made up from water stored, and stored in all probability in a season when the water power is to be valued at a lower scale; and we will in that case have one somewhat like that of *Hard Rubber Co.* v. *City of Newark*, already referred to, where the amount diverted by the city was much greater than the flow of the river at the rubber company's works during the dry season, and hence the injury was not so great in proportion as it would have been if the diversion had been less.

The question, then, is whether or not the natural flow of the combined streams at Morris lake, in a dry time, amounts to eight hundred thousand gallons a day. No gauge of the streams at that point was ever made, so far as appears, in a dry time. The only proof we have on that subject is that of divers witnesses who swear to the small amount of water flowing in old times when the lake was all drawn out. But that is measurement by the eye, and, for that reason, unreliable, even if it estimated, as

it does not, the quantity in gallons or cubic feet. However, many of them did make observations in a very dry time when the water was used for running the old forge and also Goble's cider mill below the outlet; and a careful examination of the evidence of these witnesses, standing alone, would satisfy me that the flow in question was much more than eight hundred thousand gallons a day in the driest time.

Mr. Vermeule has made an estimate, shown in tables, of the flow in a dry time based on observations of rainfall and calculations of the amount of water per square mile which a certain amount of rainfall will produce in the hot months; and, from Mr. Vermeule's tables, Mr. Konkle, the defendant's expert, has made up three tables of the flow in cubic feet per minute in dry months—*first*, in what Mr. Vermeule classes as an average year, the lowest he made was one hundred and fifty-one cubic feet a minute in July, one hundred and forty in August, and two hundred and five in September, either of them nearly twice the amount diverted by the town of Newton; *second*, another one in what Mr. Vermeule classes as an ordinary dry year, occurring once in seven years—for July, one hundred and forty cubic feet a minute; for August, one hundred and twenty-nine; for September, eighty-three; for October, seventy-two, and for November, one hundred and twenty—all except one, it will be observed, more than the amount diverted; *third*, in an extraordinarily dry year occurring, according to Mr. Vermuele, once in fifty years, he makes the amount running in July to be fifty cubic feet a minute; August, thirty-two; September, twenty-six; October, twenty-eight, and November, thirty-seven, making an amount running less than seventy-four and three-tenths cubic feet per minute for five months in the year. The driest year was a sample year taken by Mr. Vermeule out of the driest in fifty years, and estimated not by actual flow of streams in that year but by the amount of rainfall reported at various points, and by the rule deduced from many experiments in different localities that a certain depth of rainfall in the hot months will produce a certain amount of flow in the streams, depending upon the amount of the rainfall area.

Sparks Manufacturing Co. *v.* Town of Newton.

I am unwilling to be governed by this last example for several reasons. In the first place, the value of water power ought not to be gauged by what may happen once in fifty years, or once in seven years. In the next place, I think that Mr. Vermeule's rule cannot be applied with safety to a small drainage area of three or four square miles. It is undoubtedly reliable for large areas, which in the aggregate make up for inequalities in smaller areas of which they are composed. It fails when applied to smaller areas for the reason that the local subterraneous formations vary so much that the amount of the flow of a small stream at its source is not indicated by its apparent surface drainage area. It may, and often does, draw a part of its waters from sources outside of what the surface indicates. It is common knowledge that there are many springs which flow with a volume which geologists cannot account for from surface appearance. Then in this case the proof is that Morris lake itself, which has a drainage area of only one and a quarter square miles, has a natural flow much greater than that of the whole Pine Swamp brook, which has a drainage area of two and fifty-five hundredths square miles. And this is due to springs in the bottom, the lake being one hundred feet deep. It is so stated in the answers. Its general level, in its natural state, is nine hundred feet above the sea, while around it on three sides the mountain ridge rises to a height of from one thousand one hundred to one thousand three hundred feet, giving ample opportunity for the formation of subterraneous channels and reservoirs of water which may, and probably do, empty into its bottom and increase its natural flow beyond that indicated by the apparent drainage area. In fact, it resembles a large well four or five hundred feet deep, which reaches subterraneous reservoirs.

The rate of the rise of the water in the lake when the gates were first shut is not a reliable indication of the flow of these springs, for the reason that the amount of soakage into, and absorption by, the earth banks and fissures and concealed reservoirs liable to exist there, forms a material element of the problem that cannot be properly estimated. All hydraulic engineers know that the actual storage capacity of an ordinary earth-

formed pond is greater than its cubical contents, but how much greater is not easily determined.

I conclude, then, that the result of the diversion will be to diminish the flow at Hamburg at all seasons by seventy-four and three-tenths cubic feet per minute, and diminish the net minimum horse power by two and fifty-four hundredths net continuous horse power at the Sparks mill.

We come, then, to the question of the value of this two and fifty-four hundredths horse power. I fix that, for present purposes, at the cost in steam power. Mr. Vermeule's report on "Water Supply and Power," in volume 3 of the State Geological Report for 1894, was put in evidence. He gives (page 327) the cost of steam power as made up by Dr. Emery, a well-known mechanical engineer, at from $30 to $38 per horse power per year, ten hours a day, besides the interest on the cost of the plant, which, I understand, his figures make about $5 more, making the cost from $35 to $43, according to the size of the plant, the lower price being for larger plants.

Dr. Emery, called as a witness by the complainants in this cause, makes it at least $40 per year, for ten hours, or $80 per year, for continuous power, when the steam is applied to the most improved modern steam engine, viz., compound Corliss. We have seen that the actual cost to the Sparks company is at least $100 per year on their present engines.

Mr. Phillips, a competent mechanical engineer engaged in the manufacture of engines, called by the defendant, estimates the cost of steam power at Hamburg at $50 per year for continuous horse power by a simple Corliss engine, and $37 by the use of the compound Corliss. But his estimates of the first cost of the plant and of the cost of operation were confessedly made at exceptionally low figures not ordinarily attainable, and he also, as he frankly admitted, omitted several items in both the cost of the plant and the cost of operation, which were shown by Mr. Van Winkle to be reasonably necessary. Then, again, Mr. Phillips admitted that the results he stated could be attained only by careful general management, under the most favorable circumstances and with the greatest care in firing, &c. I think that

Sparks Manufacturing Co. v. Town of Newton.

thirty per cent. should be added to his estimate, bringing it up to about $60.

Another mode of ascertaining the value of water power is the price at which it rents, where, as at Paterson, Passaic, Raritan and Trenton, water power is developed for that purpose only. In those cities it rents at from $33 to $50 per year per theoretical horse power, at twelve hours a day, and the lessee finds his own water-wheel and land for the plant. Add to these figures twenty-five per cent. for the difference between theoretical and actual horse power (which is the equivalent of deducting twenty per cent. from theoretical horse power), and you have a price about equal to Dr. Emery's estimate.

Taking all things into consideration, including the cost of coal at Hamburg, the distance from market, the established business, &c., I think $65 per year per continuous horse power is the fair value to the Sparks company of their water power. This is based upon the assumption that the managers of the company, as good business men, will, sooner or later, find it to the interest of the company to substitute a modern, improved engine for the large one they now have in use.

In fixing this sum I have taken into consideration the four or five weeks in the year when there is a surplus of water, and hence no injury. I think but little can be allowed on this account, as the proof shows that the surplus flow lasts for only three or four days at a time, and cannot be relied upon or utilized except to a limited extent.

This valuation, however, is subject to a possible abatement for several causes—*first,* the cost of work necessary to be done to make the head and fall equal to twenty-two and one-half feet; *second,* the cost of maintaining and supervising it from year to year; *third,* the uncertainty of the permanency of the need of and demand for the power for present or future uses.

With regard to the first. Assuming that it will cost $400 or $500, as estimated by Mr. Van Winkle, to obtain the head of twenty-two and one-half feet, I think that nothing should be charged against the Sparks company on that account, for the reason that I do not propose to give it credit for the increased

cost over $65 of making horse power on their present engine which it will incur, and, in. my judgment, reasonably incur, until it shall find it convenient to substitute a more economical one in its place. I say "reasonably" because I do not think, as prudent business men, its managers are called upon to make an immediate substitution. I take it that for several years to come it will be paying $60 or $70 a year more for the substituted steam power than the amount I have allowed, and I offset one against the other. And it is to be observed that this cost of enlargement is not to be charged against the two and fifty-four hundredths horse power due to diversion alone, but to the whole plant, which will be improved in value as a whole, and the proportion to be borne by the power diverted is but trifling.

With regard to the second—the cost of supervision and maintenance. The evidence on this point is meagre and quite insufficient to form the basis of a reliable conclusion if it were necessary to do so. But I conclude that nothing on that account should be charged against the complainant, for the reason that the cost of supervision and maintenance of its water power proper will be precisely the same after it is reduced by the proposed diversion as it was before. In other words, the effect of the diversion will be to increase the *pro rata* cost of supervising and maintaining the power that remains. The cost of repairs to, and of renewal of, the dam, water-wheels, &c., and of daily watching it, is necessarily a fixed quantity. It must be borne in mind that the complainant company is not selling either the whole or an undivided share in the mill property (in which case in order to appraise its value all these matters of renewal, maintenance and supervision would have to be taken into consideration), but it is being deprived of the use of a certain part of that property in such a way that it cannot reduce the cost of the maintenance and use of the balance in proportion to the amount remaining.

The *Hard Rubber Co. Case* and the others arising out of the diversion of the Pequannock river for the supply of Newark, were, in effect, as I understand them, cases of substantially a total diversion for a considerable portion of the year, and hence

practically a total destruction of the water power.   For such an injury the value of the water power as a whole became a controlling element—its ascertainment required the element of the cost of maintenance, &c., to be taken into consideration.

And with regard to the third matter—the permanence of the value which I have fixed for present purposes.   It is an admitted fact that, if the present business should for any reason become unprofitable and abandoned, the water power would be of much less value for want of a market.   No business of letting out water power has been established at that point, as in Paterson and the other towns above mentioned, nor is there a large population or variety of industry which would call for its use, as in Newark or Jersey City.   A market must be found for it.   Some capitalist must be induced to come there and take it.   Hence, what are called abandoned water powers, or water powers not in use, are rated much lower than those in actual use.   In the Pequannock cases, I understand they were rated at less than one-half of the value of power in actual use.   And the difficulty is to ascertain how much that diminishes the present value.   As I have already remarked, the indications are that water powers of sufficient size and eligibly located will be sought for in the future more than in the past.   The prices of coal, and of boilers and engines by which to make steam, and of skilled labor to manage it, are uncertain quantities and may fluctuate, but the water power is as permanent as the laws of nature, and the operation does not require skilled labor.   On the other hand, comparing it with the cost of steam power, we must remember that the cost of water power goes on day in and day out, and year in and year out, whether it is actually needed every day or not, while a steam engine lying idle costs nothing but the care to keep it in order.

Dr. Emery, called by the complainants, gave an essay on that subject, in which he estimates the average continuance of a settled and profitable business at over forty years, and makes that period an inside limit, and bases the present value of a horse power in use on its continuance for forty years, and compounds it at that rate.   His formula is this : eighty dollars a year for

each horse power for forty years, compounded at four per cent., is worth at present $1,600. If it was compounded perpetually at four per cent., it would be worth $2,000. He makes a deduction of twenty per cent. for the probability of the water power becoming unused in the future. He fixes his forty-year or upward limit upon what he says is a long-continued observation of the course of business in such matters, and, as I understand his lecture, he makes proper allowance in that formula for the possible and probable value of the power when it does fall into disuse.

I think there is much sense in this theory, and in the absence of any better formula I shall adopt it. I shall compound the value at four per cent. That is fully as favorable to the defendant as the evidence will warrant. The proofs before me were quite clear, and it is a matter of common knowledge that what are called first-class investments cannot be placed at much over three and three-quarters per cent., and the decided tendency is toward lower rates. By "first-class investments" I mean those which require little or no personal care or supervision in order to avoid loss. It is common knowledge that money cannot be invested permanently at five per cent. without some risk, and without constant care and supervision to prevent loss. The property which is here being taken is of a kind that does not deteriorate or depreciate by time, and is not destroyed by any ordinary agencies. In other words, it takes care of itself without any supervision, and there is no risk of its being lost. Hence the equivalent paid should be equally stable.

Applying the formula here, we have the horse power 2.54 x $65 = $165.10 (one hundred and sixty-five and ten-hundredths dollars) as the annual value of the power, and that compounded for forty years at four per cent. is $3,302 (thirty-three hundred and two dollars), which I fix as its value to the Sparks Manufacturing Company. It is to be observed that if we compound the annual value perpetually at five per cent. it will produce the same result.

In fixing this value I have taken into consideration the trouble of watching the meter.

Sparks Manufacturing Co. *v.* Town of Newton.

The amount fixed does not cover any damages for unusual detention of the water during the time that the reservoir was being filled after the dam was finished. For that the Sparks company has its action at law.

#### INGERSOLL'S CASE.

I come now to Ingersoll's case, which presents much more difficulty by reason of the presence of other circumstances.

In the first place, it does not clearly appear that his business is of a character to warrant the expense of using steam. In other words, it does not appear that, for present purposes, his power is worth to him as much, and should be valued as high, as steam power, but the contrary is to be inferred; and yet it must approach it in value pretty nearly, for it is common knowledge that grain mills driven by steam power have recently been erected and are now in successful operation, located on a railroad, with switching privilege, in country towns in this state, while small-power gristmills in the same neighborhood have been abandoned. At least two instances of that kind are found in Morris county.

Ingersoll's business is the grinding of grain of all kinds and for all purposes. His plant resembles that of the New York and Brooklyn mills, known as "city" mills. He makes the best roller-process flour, also meal, horse and cattle feed. He buys his grain from the West, delivered at his mill on the same terms that it is delivered in New York, but his market is somewhat limited, and he sells mainly in the neighborhood and along the lines of the railroads leading from his mills in various directions into the country. It does not appear that he is able to compete with the city mills. The probability is that he does not do business upon a scale large enough and has not a reputation which will enable him to do so. The actual profits of his business were not shown, but it is fairly to be inferred that it is reasonably profitable. His business includes what is known as gristwork, namely, the grinding of grain for toll for farmers in the neighborhood, the doing of which characterized the old-

fashioned gristmill; but that forms a very small part of his business.  Hence, his plant cannot be compared with an ordinary gristmill, so many of which have become valueless in late years owing to the falling off in grain production in this state, and especially in Sussex county, and to the cheapness of transportation from the grain-producing regions of the West.

It appears that his business requires substantially all his power during most of the year—that is, all to be obtained during ordinary working hours—and that in dry seasons he is obliged to run nearly all night, and cannot run all his machinery at once.  Some of his millstones are necessarily idle for want of power.  At the same time the nature of his business is such as to somewhat adapt itself to the fluctuations in the quantity of water and power.

In the second place, his power is not fully developed nor applied to the best advantage.  His whole head and fall is over twenty-five feet, but he uses only eighteen or twenty of it.  Then his water-wheels are not well arranged.  His turbine is too large, and at full gates will produce one hundred horse power and upwards at its present head of less than twenty feet, and takes much more than the flow of the stream in dry-weather stages.  Hence, he is obliged to frequently run it on partial gates, and thereby considerably reduce the percentage of power which he obtains.  If it were subjected to the full head of twenty-five feet it would use still more water.  Then, besides the turbine, he has a good overshot wooden vertical wheel which develops a less percentage of theoretical power than a turbine, but as much power as any of that kind, namely, about seventy to seventy-two per cent., and has the advantage over turbines, which all vertical or bucket-wheels have, of being able to run on a smaller quantity of water and develop from it the same percentage of power that it does from a larger quantity.

The best arrangement of wheels for use on a fluctuating stream is a turbine set to take all the dry-weather flow, and an overshot of a size sufficient to take and use the balance in higher stages of the water.  The two should be geared together.  Ingersoll's

wheels are not geared together, and it is plain that he labors under a disadvantage in that respect.

Then he has no pondage, and is at the mercy of the mill above for water, and, as that runs night and day, he is substantially confined to the use of the natural stream without any pondage.

With regard to the changes necessary to utilize the whole of his head and fall, defendant's expert estimated the cost of excavation and masonry necessary to utilize the whole twenty-five feet at several thousand dollars, but complainants' expert's opinion is that it is not worth while to spend so much, and that for about $2,000 twenty-three and one-half feet net head and fall can be obtained. I am inclined to adopt that view. But I think that, in order to use his power to advantage, two new water-wheels will be required to take the place of the present ones, and the total cost of the change will be from four to five thousand dollars, which, as we have seen, is to be distributed over the whole power.

I shall take twenty-three and one-half feet as the head and fall, and that gives three and thirty-one hundredths theoretical continuous horse power, or two and sixty-five hundredths net continuous horse power, or five and thirty-hundredths horse power for twelve hours, from eight hundred thousand gallons of water per day.

This deduction of eight hundred thousand gallons a day will undoubtedly be felt at Mr. Ingersoll's mill.

The percentage of the dry-weather flow (Vermeule's tables) is as follows: Three per cent. of the flow for the three driest months in an ordinary dry year, six per cent. of the flow in three driest months of the dry year occurring once in seven years, and fourteen per cent. of the average flow for five months of the extraordinary dry year occurring once in fifty years. In dry weather it will actually restrict the amount of work to be done, and in other seasons it will prolong the hours of work in order to accomplish the same result. In the latter instance it will add simply to the cost of labor and to the inconvenience of operation.

These circumstances show that the problem is not so easy of solution as in the Sparks case. Looking further and com-

paring general values, we find the Sparks company's plant was valued by experts at $200,000, which included, of course, the steam engines, boilers and paper-making machines. On the other hand, Mr. Ingersoll's property was valued by competent experts at from $35,000 to $60,000 for water-power purposes alone, namely, by one expert at $35,000 for a silk mill, and by another at $60,000 for a paper mill. This last estimate was based upon the power being worth to a paper-maker $6,000 a year, or ten per cent. on $60,000, and thus left a good margin for a profit to a purchaser at that price. It appears, as we have seen, that the location is favorable for a paper mill, and that the power can be advantageously united with Sparks' by electricity. The dam is of stone, bedded at the bottom and ends in the solid rock, and is in all respects a first-class affair.

I am unable to say that the estimate of the expert who fixed the highest value is extravagant. He appeared to have had great experience in dealing in such property, and his evidence was not shaken on cross-examination or contradicted. The proofs show that the Sparks company expends for coal for power in its paper mill between five and six thousand dollars a year. Evidence was, indeed, given by defendant's experts as to the value of the property for milling purposes only, but I think that has little weight. Those experts evidently had in mind the old-fashioned gristmill which depended for business on the grain raised in the neighborhood, and has become nearly valueless.

I make the power produced by the stream to be eighteen continuous horse power for the average of Mr. Vermeule's five dry months occurring once in fifty years, and forty-six horse power for the three dry months of his dry year occurring once in seven years, and eighty-two horse power for the three dry months of his average year, in which I understand he includes the dry year occurring once in seven years. Deducting from this last for leakage in the gates and the necessary waste in use, we have a minimum of seventy-six horse power. To this must be added the average of what can be obtained during the months of more copious flow. This I make, from Mr. Vermeule's tables, about

one hundred horse power, or one hundred and seventy-five in all. But this extra one hundred horse power, on account of its inconstancy, I think should not be reckoned, for practical purposes, at much more than one-half the salable value of the constant power, which would make the effective continuous horse power one hundred and twenty-five, and this, at $6,000 a year, makes about $20 per horse power, and capitalized at four per cent. produces a valuation of $500 for each continuous horse power. But the valuation of $6,000 a year given by the expert is for the water power in block, in connection with the land, but excludes the grain-mill plant, and the purchaser would assume the additional burden of the cost of maintenance and supervision of the dam and machinery and the general management of the business; and this, as we have seen, is a constant quantity, and will amount to the same for seventy-two and forty-hundredths horse power as for seventy-five horse power. Hence it is that if this stream were so constant as to produce, with the same dam and appliances, a minimum of one hundred horse power, it would be worth much more than thirty-three per cent. in addition to its present value; and if you reduce its power to a minimum of fifty horse power, you would reduce its attractiveness to capitalists and its value much more than thirty-three per cent. The valuation of the complainants' experts was based upon an idle power, such as Dr. Emery counted as of little value. But this is not an idle power. It is in use, and, as before remarked, Mr. Ingersoll will undoubtedly feel the effect of the abstraction more perhaps than if he used auxiliary steam power, for unless he puts in steam in its place he will be obliged at times to absolutely reduce his business just so much, and at other times, as we have seen, will be inconvenienced and put to additional cost.

The cost of putting in, maintaining and using a small steam-power plant sufficient to make up for the loss of the quantity abstracted, would be on so small a scale that the cost per horse power produced by it would be much greater than that I have estimated for the cost per horse power in the Sparks mill, which was based on a one hundred horse-power engine. I think that I cannot adopt the complainants' position that the value of the

27

power taken in a case like this must be reckoned at the cost of supplying it with steam. It does not appear to me from the evidence that Mr. Ingersoll's business warrants such an expense.

Now, in fixing values in these cases the rule seems well settled that all reasonable and substantial doubts—not fanciful doubts— shall be resolved in favor of the landowner. He is the passive party. The owner is the active party, and is taking property against the will of the other. A mistake, however honest, made in these cases can never be rectified, and ought not to be made against the landowner. He is entitled to just compensation ; no more, and no less. He holds his property subject to the state's eminent domain, upon receiving just compensation. That means full compensation ; and we should be reasonably sure that we give it, keeping always within the limits of common sense and sound judgment, and not being carried away by fanciful and extravagant notions.

Taking into consideration all these matters—namely, the size of the power, the solid character and probable durability of the dam, the location of the plant, the probability of its being in demand for use for other than present purposes, the probable interference with and injury to the use of the mill for present purposes, the permanent character of its present use, the circumstance that the cost of maintenance and supervision of the power after the abstraction will be precisely the same as it was before ; in other words, that the reduced power will be worth less per horse power than the present—and also the trouble of watching the meter in defendant's main—I think that $2,650 will be reasonable compensation to Mr. Ingersoll for the injury done him.

One other matter remains to be considered. Complainants set up in their bills, and it clearly appeared in the evidence, that it is the intention of the town of Newton to use a portion of the water which it will divert for other than domestic and other public purposes, namely, for the producing of power for mechanical purposes—running printing presses and meat-cutting machines and the like—and took the ground that the town could not in law acquire the right, as against unwilling land-

owners, to divert water for such purposes, but must be strictly confined to such diversion as was necessary for public uses, and contend that there should be an injunction against its use of it for the purpose of making power.

The complainants are undoubtedly right in their general position, and I am of the opinion that if the defendant had applied to the proper tribunal to condemn the right to divert eight hundred thousand gallons a day, and the question of the necessity for the diversion of that amount had been raised by *certiorari* or otherwise, it is doubtful if any court would have held that it was necessary for it to divert that quantity for the use of the town of Newton, either at present or for any probable future public use. I am aware that the courts have been liberal in construing the word " necessary " in this connection, and encourage private water companies and municipalities condemning water rights to acquire an ample supply. But eight hundred thousand gallons a day is three hundred gallons a day per head for the present population of Newton (Morristown uses about fifty gallons per head), and a fairly economical use would not require more than fifty or sixty gallons a head, and on strict condemnation proceedings the town would be confined to the amount necessary for domestic uses. It is, however, to be observed that the capacity of the water main was arranged with a view to an ample supply of water for fire extinguishment purposes, and hence far exceeded what is necessary for ordinary domestic use. But the position of the parties in the present case does not admit of the enforcement of the test of strict public use. The complainants are in the position of insisting, both at the hearing and at the final argument, that the defendant should be compelled to pay for one million two hundred and fifty thousand gallons a day, because it was supposed that it might, by an unrestricted use of its plant, abstract that much from the river, and they protested vigorously against its being allowed to limit itself to eight hundred thousand gallons a day.

Now, under these circumstances, I do not think that it lies in the mouths of the complainants to question the use to which these eight hundred thousand gallons shall be put. They must

be held to have admitted that that amount of water is a reasonable amount for the use of the town of Newton for public purposes, either in the present or some time in the future, and that the town might have acquired that much by regular condemnation proceedings.

Granting that for many years to come there will be a surplus left after supplying domestic needs, it is a matter of indifference to the complainants what use it is put to. Having received compensation for it, they have no right to raise any question on that subject. This was ruled in the *Hard Rubber Case.* The attitude taken by the complainants that they will consent that the town may use the water for any purpose it chooses provided it will pay for one million two hundred and fifty thousand gallons a day, but that they will not consent to such use if the town insists upon taking and paying for only eight hundred thousand gallons a day, does not strike a court of equity with favor.

I will therefore advise a decree giving to the defendant the right to divert eight hundred thousand gallons a day from Morris lake upon condition that it shall pay to the complainant the Sparks Manufacturing Company the sum of $3,302 and to the complainant Worthington H. Ingersoll the sum of $2,650. The decree must provide that the defendant shall place in its main, at a convenient point, and forever maintain, a proper meter to measure and register the daily flow of the water, which shall be open to the inspection of each of the complainants or their agents, the character of the meter and its location and application to be approved, in case the parties cannot agree, by a competent engineer to be appointed by the court. But I will give the defendant the option of dispensing with the meter and taking the privilege of using all the water that its works, as at present constructed, with a reservoir near the town to be added, will convey to Newton, without using any contrivances to overcome the effect of the elevated point in the main, which, in its present condition, limits its capacity, upon condition that it will pay to the complainants, severally, twenty per cent. in addition to the amounts above fixed. This, I think, will do ample jus-

tice to the complainants, because they will be relieved of the trouble and expense of watching the meter, and I am satisfied, as before remarked, that it is practically impossible for the town, even with the help of a reservoir, ever to use the whole one million two hundred and fifty thousand gallons and at the same time supply the higher portions of the town of Newton.

In addition to what I have already said on that subject, it is further to be remarked that in working out the plan of supplying the higher portion of the town from a nearby reservoir during a portion of the day of twenty-four hours, and supplying for mechanical purposes the lower portion during the same period through the great main directly from the lake, the defendant will meet this hydraulic difficulty, namely, that the increased power due to the greater difference in level between the lake and such lower portion will be, partially at least, exhausted in the increased friction due to an increased rate of flow in the main necessary to obtain the greater discharge. In other words, in order to keep up a pressure which will produce power and do work, it is necessary to reduce the quantity delivered. Hence, in practice, the defendant never will be able to beneficially use the maximum flow of the main, even for a portion of the day of twenty-four hours.

The complainants are each entitled to costs.